Christian Omar WALKER, Appellant

v.

COMMONWEALTH of Kentucky,
Appellee.

No. 2007–SC–000568–MR.

Supreme Court of Kentucky.

June 25, 2009.

Erin Hoffman Yang, Assistant Public Advocate, Department of Public Advocacy, Frankfort, KY, Counsel for Appellant.

Jack Conway, Attorney General, Susan Roncarti Lenz, Assistant Attorney General, Office of the Attorney General, Criminal Appellate Division, Frankfort, KY, Counsel for Appellee.

Opinion of the Court by Justice SCOTT.

On June 5, 2007, Appellant, Christian Walker, was found guilty by a Jefferson Circuit Court jury and convicted of complicity to murder, complicity to robbery in the first-degree, complicity to assault in the second-degree, and complicity to tampering with physical evidence. For these crimes, Appellant was sentenced to fifty (50) years imprisonment. Appellant now appeals his conviction as a matter of right. Ky. Const. § 110(2)(b).

## I. *Background*

On December 8, 2004, Phillip Thomas was living with his mother, Shirley Thomas, and his wife, Jutta Whitlow, on Camden Avenue in Jefferson County. Jutta was a freshman in college at the time and had just finished her last day of school for the semester. Earlier in the evening, Phillip had taken her out for dinner and dropped her off at the house by herself. Phillip had recently started his own entertainment company and, at approximately 9:00 pm that night, left his home for a business meeting in Shively (an apartment complex), near Ramser Court. Shirley Thomas had been at a church meeting and choir practice that evening and did not arrive home until later that night.

Jamilah McNeely lived in an apartment complex in Ramser Court. Jamilah had known Tywan Beaumont for three to four years and she and Beaumont had a child together. She had known the Appellant, Christian Walker, for about the same

amount of time that she had known Beaumont. On the evening of December 8, Beaumont and Appellant picked her up from work at about 8:00 pm. Appellant, driving Beaumont's car, dropped Jamilah and Beaumont off at her apartment and left.[1] Not long after Beaumont went inside, Appellant returned and Beaumont left with him.[2]

Meanwhile, Phillip's business meeting ended and he returned home to Camden Avenue between 9:30 and 9:45 pm, just a few minutes after his mother, Shirley, had returned from choir practice. Arriving at his house, Phillip backed his car into the backyard. Upon exiting his car, Phillip noticed a person "flash" by in his rearview mirror. The man, armed with a handgun and wearing a ski mask, jumped over the trunk of Phillip's car and pointed the gun at Phillip's face.[3] Phillip then noticed another man pacing back and forth on the side of the house, also armed with a handgun and wearing a ski mask.[4] Both men began yelling at Phillip and demanding that he give them his money and any drugs he had. The first gunman threatened to kill Phillip if he did not comply. Phillip had only $4.00, which prompted the gunmen to rifle through his pockets.

At this point, Jutta, inside the house, heard Phillip turn off his car. Though he did not sound panicked, he called her name twice. Jutta looked out the window and saw Phillip outside the car with someone standing behind him.[5] Jutta then went to look out the kitchen door. As she did so,

the taller man standing behind Phillip immediately turned and shot her, hitting her in the upper left groin.

After shooting Jutta, the taller man ran around the side of the house toward the front yard and was followed shortly thereafter by the shorter gunman. Meanwhile, Jutta, now injured, made her way to the front of the house where she met Shirley between the kitchen and the living room. In an effort to escape without further injury, Shirley held Jutta's arm and, together, the two ran towards the front door.

Adam McMillan lived two houses down from the Thomas house and, on that night, heard shouting from the alley. As he walked towards the door, he heard a gunshot. He saw two men in black jackets standing on the driver's side of the car yelling for money. Adam could hear one of the gunman say, "Give me the fucking money!" In response, he heard someone else say, "Calm down, I'm giving you the money." Adam then ran through the house and out the front door to get his pistol from his truck.[6]

While Adam was at his truck in front of his house, he saw an African American man in a dark jacket running towards him. The man, who Adam estimated to be about 6′3″, jumped in a parked car, backed it down Camden Avenue, and drove away. Then, as Adam was putting a shell in his gun, he heard two gunshots. Adam looked toward the Thomas house and saw a shorter gunman running at him. Believing that the man was raising a weapon, Adam shot

---

1. Appellant was wearing a black jacket over several layers of different colored t-shirts.

2. Beaumont was wearing blue jeans, a brown hoodie sweatshirt, and brown boots.

3. Phillip testified that the man was tall and thin, armed with what looked like a "cowboy" gun, or a revolver.

4. The second man was shorter and about Phillip's height, carrying what Phillip described as a "flat gun," or a semi-automatic handgun.

5. Jutta described the man as wearing a dark grey ski mask, a dark colored hoodie sweatshirt, and jeans.

6. The pistol was identified as a semi-automatic, 9–millimeter handgun.

twice at the man, hitting him in the shoulder.

Wounded, the shorter gunman ran into the backyard, firing his gun at Phillip before fleeing down an ally. The bullet missed, however, hitting a tire on Phillip's car. Phillip then ran to the front of the house where he saw his mother lying down and discovered that she had been shot in the chest. He held her head in his lap while Adam attempted CPR without success.[7]

Jutta recalled that as she and Shirley were running out the front of the house and down the porch steps, the shorter gunman began shooting at them.[8] As the gunman turned to shoot, Shirley screamed and pushed Jutta back into the doorway. When Jutta realized that Shirley had been shot, she crawled into the house, grabbed a phone (to call 911), and hid in a closet.

Jamilah was across the hall at a friend's apartment when Beaumont returned. She testified that Beaumont arrived crying and shaking and that he had driven back to her apartment alone. Beaumont told Jamilah that he and Appellant were in a backyard robbing a man when he might have shot a woman who had come to the back door of the home. At about this time, Appellant called Beaumont's cell phone and the two began to argue. Jamilah heard Appellant say that he had been shot and that Beaumont left him at the scene, asking Beaumont why he shot "that lady."[9] With a gunshot wound in his right shoulder, Appellant later visited Jamilah's apartment where the two men continued to argue.

The police came to Jamilah's apartment the next evening. Jamilah, initially, refused them entry because she had three outstanding bench warrants. However, when one of Jamilah's neighbors called and said that homicide detectives were outside and that they were looking for a wounded person, Jamilah relented and the police handcuffed and arrested Beaumont.[10] During their search of the premises, the police found a .38 caliber bullet in one of Beaumont's jacket pockets. Among other items, the police also recovered a garbage bag containing a bloodstained shirt with a bullet hole in its right shoulder, as well as a black ski mask.[11] Via DNA analysis, the shirt was traced to Appellant and the ski mask to Beaumont.

Appellant's testimony differed significantly in some respects from the Commonwealth's theory of the case. Appellant stated that on the evening of December 8, 2004, he, along with Beaumont, had picked up Jamilah and her girlfriend in Beaumont's car. Appellant testified that it was, in fact, Beaumont, and not he, that drove everyone to Jamilah's apartment. At some point later, Beaumont called Appel-

---

**7.** The assistant medical examiner found that Shirley Thomas died as a result of a gunshot wound to the chest, concluding that she had bled to death within minutes.

**8.** The edge of the porch was located approximately three feet away from where the gunman shot.

**9.** On cross-examination, Appellant stated that he was referring to the woman in the back of the house.

**10.** Appellant turned himself in the next day.

**11.** A search of Phillip's car revealed a right palm print and three left fingerprints, all of which belonged to Beaumont (on the driver's exterior and interior window). A projectile fragment was found in the left rear tire of Phillip's car and the police located a bullet hole on the driver's side door. Police excluded the shots Adam fired from those that struck Phillip's car, Jutta's leg, and Shirley's chest. However, police could not determine whether the bullets that were used to shoot the two victims were fired from the same gun—only that they were fired from a .38 caliber revolver and not a semi-automatic handgun. The firearms used by the gunmen were never recovered.

lant at Jamilah's apartment and told Appellant to come outside because he was going to take Appellant to help him "repo" a car for one of Beaumont's friends.[12] Beaumont drove to Camden Avenue and Appellant claimed he did not know where they were going.

Upon arriving at the Thomas house, Appellant stated that the two put on their ski masks and that Beaumont gave him a semi-automatic, 9-millimeter handgun, telling him to stay on the side of the house. During the robbery, Appellant claimed that he stood on the side of the house and nervously paced back and forth there before Beaumont shot a woman through the back door. At this point, Appellant stated that Beaumont ran toward the front yard and toward his car. Appellant, still behind the house, then heard Beaumont fire his gun and did not leave the backyard until he heard several more gunshots. When he ran to the front yard, Appellant saw someone pointing a gun at him and, after being shot, he fled by foot. Appellant explained that he never meant for anyone to be shot and that he did not know that Beaumont was going to shoot others.

At the conclusion of the trial, Appellant was convicted on all counts of the indictment. In conjunction with Appellant's murder conviction, the jury found its commission during the first-degree robbery to be an aggravating circumstance and fixed Appellant's prison sentence at fifty (50) years. The jury further fixed sentences of seventeen (17) years, ten (10) years, and

12. The evidence did not show that either Beaumont or Appellant ever attempted to take Phillip's car during the robbery.

13. Beaumont was also convicted of complicity to murder, complicity to robbery in the first-degree, complicity to assault in the second-degree, and complicity to tampering with physical evidence. Similarly, in conjunction with Beaumont's murder conviction, the jury found its commission during the first-degree

two (2) years, respectively, on the other charges, recommending they run consecutively with each other for a total of twenty-nine (29) years, but concurrently with the prior sentence of fifty (50) years, for a total sentence of fifty (50) years imprisonment.[13] On appeal, Appellant raises three principal allegations of error: 1) that the trial court abused its discretion when it failed to strike a juror for cause; 2) that the trial court abused its discretion in excluding certain statements made by Beaumont; and 3) that the trial court subjected him to double jeopardy by reinstating a charge against him. For the reasons that follow, we affirm Appellant's convictions in part and reverse in part.

## II. *Analysis*

### A. The Trial Court Did Not Abuse Its Discretion When It Failed To Strike A Prospective Juror For Cause Because There Was No Showing Of Bias.

Appellant argues that his conviction should be reversed because the trial court forced him to use all of his peremptory challenges when it failed to strike an allegedly biased juror for cause. Consequently, Appellant claims that he was denied his right to a fair and impartial jury in violation of Sixth and Fourteenth Amendments of the United States Constitution, as well as Section 11 of the Kentucky Constitution. We decline to reverse Appellant's conviction because the trial court did not abuse its discretion.

robbery to be an aggravating circumstance and fixed his prison sentence at fifty (50) years. The jury further fixed sentences of fifteen (15), five (5), and two (2) years, respectively, on the other charges, recommending that they run consecutively with each other for a total of twenty-two (22) years, but concurrently with the prior sentence of fifty (50) years, for a total sentence of fifty (50) years imprisonment.

Appellant argues that Juror No. 147866 was biased because he could not consider the full range of penalties nor all types of mitigating evidence. A review of voir dire indicates the following occurred at trial regarding Juror No. 147866:

During individual voir dire, the trial court explained to Juror No. 147866 that he would be required to consider each of the penalty ranges if, after listening to the evidence and jury instructions, the jury returned with a guilty verdict. The trial court specified the potential penalty ranges and Juror No. 147866 stated that he could consider each penalty range and that he would not automatically impose the death penalty, indicating also that he would keep an open mind with respect to the aggravating and mitigating circumstances as well as the lower penalty ranges (a term of years).

· After the trial court questioned the juror, defense counsel for Beaumont asked him to give thought to the following hypothetical scenario: whether he could still consider the lowest penalty range (20–50 years) if he was to find the defendant guilty beyond a reasonable doubt of murder where there was no evidence of any justification or excuse but only affirmative evidence that it occurred in the course of a violent felony. The juror answered that, in the specific hypothetical, he would probably choose life without parole assuming, he added, that the defendant acted with "malice and forethought." He also stated that, under the hypothetical given, he could not consider life without parole for 25 years or life.

Defense counsel for Beaumont then began asking the juror if he could consider certain mitigating evidence. Specifically,

defense counsel asked if his decision would be influenced if he discovered that the defendant was relatively young, that he did not have a significant criminal record, or that another individual was more culpable. The juror stated that the defendant's age could affect his decision but that he would view the defendant's prior criminal history as less relevant. In addition, the juror stated that, for a young defendant, and under the prior hypothetical given him, he could still not consider a term of years or life but that he could consider life without parole for 25 years, life without parole, or death.

When the Commonwealth questioned Juror No. 147866, he stated that he understood that the situation proposed by defense counsel was hypothetical and that, absent that hypothetical, he could consider all of the penalties, keep an open mind, and listen to all of the facts and evidence before making a decision. The juror again affirmed that he could set aside any preconceived notions and consider the full range of penalties.

At the conclusion of the individual voir dire of Juror No. 147866, the trial court asked if there were any motions. Defense counsel for both Beaumont and Appellant moved the trial court to strike the juror for cause. Defense counsel for Appellant argued that the trial court had, that day, previously stricken a juror for cause for similar statements. Defense counsel for Appellant continued, urging that the hypothetical given to Juror No. 147866 was similar to Appellant's case and that the prospective juror could not consider all of the penalties or mitigating factors.

The trial court overruled both motions, explaining that it understood the comparison between the two jurors but that it was able to recognize a qualified juror.[14] The

14. The trial court cited to *Sherroan v. Commonwealth*, 142 S.W.3d 7 (Ky.2004), for its position.

trial court stated that it denied Appellant's motion upon its view that Juror No. 147866 was, in fact, "very well qualified," and that it knew lay jurors could be lead up the "proverbial garden path." When the trial court indicated that it had made its final ruling and would not revisit Appellant's motion, Appellant, through counsel, struck Juror No. 147866 with one of his joint peremptory challenges and, in the course of doing so, made use of all such challenges.[15]

"In Kentucky, the right to an impartial jury is protected by Section 11 of the Kentucky Constitution, as well as the Sixth and Fourteenth Amendments to the [United States] Constitution." *Fugett v. Commonwealth*, 250 S.W.3d 604, 612 (Ky.2008); *see also Fugate v. Commonwealth*, 993 S.W.2d 931, 939 (Ky.1999). "RCr 9.36(1) provides that the trial judge shall excuse a juror [for cause] when there is reasonable ground to believe that the prospective juror cannot render a fair and impartial verdict." *Smith v. Commonwealth*, 734 S.W.2d 437, 444 (Ky.1987) (*quoting Peters v. Commonwealth*, 505 S.W.2d 764, 765 (Ky.1974)).

■■■ We have "long recognized that 'a determination as to whether to exclude a juror for cause lies within the sound discretion of the trial court, and unless the action of the trial court is an abuse of discretion or is clearly erroneous, an appellate court will not reverse the trial court's determination.'" *Fugett*, 250 S.W.3d at 613 (*quoting Pendleton v. Commonwealth*, 83 S.W.3d 522, 527 (Ky.2002)); *see also Soto v. Commonwealth*, 139 S.W.3d 827, 848 (Ky.2004). That determination, however, "is based on the totality of the circumstances ... [and] not on a response to any one question." *Fugett*, 250 S.W.3d at 613. This must be so where "the duty of the trial court" is to "'evalu-

ate the answers of the prospective jurors in context and in light of the juror's knowledge of the facts and understanding of the law.'" *Id.* (*quoting Stopher v. Commonwealth*, 57 S.W.3d 787, 796 (Ky.2001)).

■■■ If there is found an abuse of discretion in failing to strike a juror for cause, the trial court will not be reversed unless "the party had to use a peremptory challenge to strike the juror and, in fact, used all his peremptory challenges." *Fugett*, 250 S.W.3d at 613 (*citing Stopher*, 57 S.W.3d at 796). We have held that this requirement—exhausting one's peremptory challenges—"is predicated on the idea that peremptory strikes are a substantial right given to the defendant" because, "if the defendant had to use all of his peremptory strikes to remove a juror that should have been stricken for cause, a juror that he otherwise would have stricken would have been impaneled on the jury." *King v. Commonwealth*, 276 S.W.3d 270, 279 (Ky.2009) (*citing Shane v. Commonwealth*, 243 S.W.3d 336, 341 (Ky.2007)). For this reason, "the jury could never be completely fair to the defendant since he was not able to effectively exercise his right to choose jurors." *Id.*

■■■ The established "test for determining whether a juror should be stricken for cause is 'whether ... the prospective juror can conform his views to the requirements of the law and render a fair and impartial verdict.'" *Thompson v. Commonwealth*, 147 S.W.3d 22, 51 (Ky.2004) (*quoting Mabe v. Commonwealth*, 884 S.W.2d 668, 671 (Ky.1994)). "[T]he party alleging bias bears the burden of proving that bias and the resulting prejudice." *Cook v. Commonwealth*, 129 S.W.3d 351, 357 (Ky.2004) (*citing Caldwell v. Commonwealth*, 634 S.W.2d 405, 407 (Ky.1982)). Where there is such a showing, "[t]he

15. *See* RCr 9.40.

court must weigh the probability of bias or prejudice based on the entirety of the juror's responses and demeanor." *Shane,* 243 S.W.3d at 338.

■ In the case at bar, we cannot say that Juror No. 147866 could not consider the full range of penalties. Appellant contends that the trial court should have struck the prospective juror for cause because he stated that he could not consider life with without parole or the death penalty if he found the defendants guilty of murder. Yet, in making such an argument, Appellant disregards the fact that bias is not to be gleaned from "a response to any one question," but rather from "the totality of the circumstances." *Fugett,* 250 S.W.3d at 613. Here, the record shows that the juror's allegedly biased statements came as a very clear response to a specific hypothetical scenario proposed by Beaumont's defense counsel. In fact, the juror went so far as to qualify his answer as pertaining only to the hypothetical given him.

■ Furthermore, we must add that a practice of committing prospective jurors to a worst-case hypothetical was disapproved of in *Mabe,* 884 S.W.2d at 668. There, we explained that:

> Voir dire examination occurs when a prospective juror quite properly has little or no information about the facts of the case and only the most vague idea as to the applicable law. *At such a time a juror is often presented with the facts in their harshest light and asked if he could consider imposition of a minimum punishment.* Many jurors find it difficult to conceive of minimum punishment when the facts as given suggest only the most severe punishment.

*Mabe,* 884 S.W.2d at 671 (emphasis added); *see also Patton v. Yount,* 467 U.S. 1025, 1039, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984) ("The trial judge properly may choose to believe those statements that were the most fully articulated or that appeared to have been least influenced by leading."). For this reason, "[a] per se disqualification is not required merely because a juror does not instantly embrace every legal concept presented during voir dire examination" because "[t]he test is not whether a juror agrees with the law when it is presented in the most extreme manner." *Mabe,* 884 S.W.2d at 671. Indeed, here, the trial court rightly concluded that defense counsel had inappropriately attempted to lead the juror up the "proverbial garden path."

As to Appellant's contention that Juror No. 147866 could not consider all types of mitigating evidence, we, too, must reject that argument as grounds for reversal. Appellant claims that the prospective juror was biased because he stated that he could not consider a term of years or life punishment for a young defendant. However, the "entirety of the juror's responses and demeanor" shows no such bias. *Shane,* 243 S.W.3d at 338; *see also Fugett,* 250 S.W.3d at 613 ("[T]he duty of the trial court [is to] 'to evaluate the answers of prospective jurors in context and in light of the juror's knowledge of the facts and understanding of the law.' "). An examination of the record clearly reveals that the statement on which Appellant now premises his argument occurred as a response to continued questioning under the hypothetical given him.

Moreover, we have held that "asking potential jurors how they would weigh specific mitigating circumstances would ignore well-settled precedent that it is impermissible to ask voir dire questions designed to commit jurors to certain theories." *Sherroan,* 142 S.W.3d at 14 (*citing Furnish v. Commonwealth,* 95 S.W.3d 34, 44 (Ky. 2002); *Woodall v. Commonwealth,* 63 S.W.3d 104, 116 (Ky.2001)); *see also Mabe,* 884 S.W.2d at 671 ("The test is not wheth-

er a juror agrees with the law when it is presented in the most extreme manner."). This is the case at hand and, accordingly, it cannot be said that Juror No. 147866 was biased such that he could not fully consider the mitigating evidence.

Finally, we do not agree, as Appellant argues, that our decision in *Fugett* mandates a different result here because *Fugett* is factually distinguishable. In *Fugett*, we found reversible error in the trial court's failing to strike a prospective juror for cause where that juror stated that he believed that "punishment should be based only on what occurred on the day of the killing, rather than consideration of a person's past." *Fugett*, 250 S.W.3d at 613–614. The only mitigating evidence that the juror in *Fugett* found compelling was where the defendant was between the ages of ten and twelve at the time of the crime's commission. *Id.* at 614. The statements of Juror No. 147866 were not such a categorical rejection of mitigating evidence. Moreover, our reversal in *Fugett* was premised on other evidence of the juror's bias, namely, as it related to police credibility. *Id.* at 613 ("He felt firmly about his belief that the police have greater credibility in their testimony and it would not depend on which officer testified; he simply felt police have more credibility than other witnesses."). This additional and unequivocal element of bias is not present in the statements of Juror No. 147866 and thus our conclusion remains sound.

We conclude that Juror No. 147866 could "conform his views to the requirements of the law and render a fair and impartial verdict" as it related both to his ability to consider the full range of penalties and all types of mitigating evidence. *Mabe*, 884 S.W.2d at 671. Thus, we, "with due deference to the opportunity of the trial court to observe the demeanor of the prospective jurors", hold that the trial court committed no abuse of its discretion in overruling Appellant's motion to strike the prospective juror for cause. *Id.*

## B. Appellant Was Not Denied His Right To Present A Defense Because The Trial Court Did Not Err When It Excluded Beaumont's Statement.

Appellant argues that his conviction should be reversed because the trial court abused its discretion in excluding an alleged self-inculpatory statement made by his co-defendant, Beaumont, which denied Appellant his right to present a defense under the Sixth and Fourteenth Amendments of the United States Constitution. We disagree.

The statement in question occurred after Beaumont's arrest and during a police interrogation concerning the shootings. In confessing his involvement to the officer, Beaumont stated that Appellant had arrived at Jamilah's apartment armed with two handguns. When the officer asked Beaumont what Appellant did with the guns, Beaumont replied:

> He had 'em on him, Sir. Right here. He went up there and seen one gun, his left hand, he's left-handed ... might tell you he's right. I don't care, he's left-handed. He had it in his left hand ... and one, it looked like a .380 or somethin', but he, but the gun I seen, it's like a, it's like a 9 millimeter, like ...

Appellant moved the trial court to introduce these statements during trial and, again, at the close of Beaumont's closing argument, arguing that they tended to prove Appellant's innocence. Both motions were overruled and Appellant offered an avowal.[16] Appellant asserts several legal grounds for why it was error to ex-

---

**16.** The parties do not contest that Appellant's claim of error was preserved for our review.

clude Beaumont's statement. We review each of Appellant's arguments in turn.

### 1. Hearsay

A trial court's evidentiary rulings are reviewed for an abuse of discretion. *Commonwealth v. English,* 993 S.W.2d 941, 945 (Ky.1999) (*citing Partin v. Commonwealth,* 918 S.W.2d 219, 222 (Ky. 1996)). Under this standard, a trial court's evidentiary ruling will not be disturbed unless its ruling was "arbitrary, unreasonable, unfair, or unsupported by sound legal principals." *Id.*

A fundamental rule in the law of evidence is that hearsay evidence is inadmissible evidence. However, hearsay evidence may be admissible if "it meets one of our well established exceptions." *Wells v. Commonwealth,* 892 S.W.2d 299, 301 (Ky.1995). There are, indeed, many exceptions to the general rule against hearsay and they "grew from ancient common law supported by the theory that the character and context of . . . [the] statement adds sufficient reliability to permit [its] admission." *Id.*

Appellant does not contest that the statement he sought to introduce was hearsay—i.e., "offered . . . to prove the truth of the matter asserted." *Id.* Rather, Appellant argues that the trial court should have admitted Beaumont's statement as a hearsay exception because it represented a declaration against penal interest under KRE 804(b)(3). KRE 804(b)(3), however, is not applicable to Beaumont's statement for several reasons.

First and foremost, Appellant makes no attempt to demonstrate that Beaumont was an unavailable witness at trial. A showing of unavailability is a clear and fundamental prerequisite to the introduction of statements under KRE 804(b)(3). *Marshall v. Commonwealth,* 60 S.W.3d 513, 519 (Ky.2001) (citing *Justice v. Commonwealth,* 987 S.W.2d 306, 313 (Ky. 1998); KRE 804(b)) ("In order for the hearsay exception for statements against penal interest to apply, the proponent of the statement must show that the declarant is unavailable.").

Secondly, Appellant's argument rests on a misconstruction of the facts. Appellant claims that Beaumont, through his statement, admitted that Appellant was carrying two semi-automatic handguns. This, Appellant argues, was evidence that Appellant could *not* have used a revolver in the subsequent assault and murder and, furthermore, that it must have been Beaumont who used a revolver—thus inculpating Beaumont and exculpating Appellant of those crimes.[17] Aside from the fact that this argument does not logically follow— i.e., if Appellant possessed semi-automatic weapons prior to the crime, he subsequently could not have used a revolver-this detail was simply not in Beaumont's statement to begin with. The record shows that his statement only indicated the caliber of the handguns; the guns' style or type was not implied, let alone stated, as Appellant asserts.

Third, and finally, Beaumont's statement, taken in context, did not tend to subject him to criminal liability. KRE 804(b)(3). "Context is important in all situations involving [the KRE 804(b)(3) hearsay] exception but perhaps more crucial in the evaluation of statements against penal interests, *especially those made by declarants speaking to police authorities who have them in custody for criminal charges* " Robert G. Lawson, *The Kentucky Evidence Law Handbook,* § 8.45[6], p. 635 (4th ed.2003) (emphasis added); *see also Williamson v. United States,* 512 U.S.

---

17. Appellant's argument appears to hinge on the fact that ballistic evidence was presented at trial that demonstrated that both Jutta and Shirley were shot with bullets fired from a revolver and not a semi-automatic handgun.

594, 603, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994) ("[W]hether a statement is self-inculpatory or not can only be determined by viewing it in context").

Here, Beaumont's statement occurred within the context of him explaining that Appellant "killed" Shirley Thomas. As such, the statement was clearly not inculpatory in nature. A review of the interrogation transcript demonstrates the statement's proper context:

> Officer: Do you know where he put the guns, where he got rid of 'em, but he's still got 'em? Has he still got 'em with 'im? And you don't have any idea where he's at.
>
> Beaumont: I mean, he killed her, man. The man's crazy. He's dangerous. I'm tellin' you.
>
> Officer: I, I can tell that.
>
> Beaumont: I mean, he killed her, man. The man's crazy. He's dangerous. I'm telling you ... I'm tellin' you. I'm tellin' you a lot o' stuff right here, man, 'cause I ain't going down for somethin' I ain't done. I got a life to live, I got a live to live, and I don't know if you see it
> ...

It is evident that Beaumont's statement was nothing more than a self-serving attempt to "shift blame." *Williamson*, 512 U.S. at 603, 114 S.Ct. 2431; *see also Vincent v. Seabold*, 226 F.3d 681, 687 (6th Cir.2000) ("[T]the proper ... analysis ...

requires examining the circumstances in which the statements are made in order to determine whether they are self-inculpatory or self-serving.").

Next, Appellant argues that the trial court should have admitted Beaumont's statement as a hearsay exemption because it represented an admission by a party-opponent under KRE 801A(b)(1). We conclude, however, that KRE 801A(b)(1) is not applicable to Beaumont's statement.

■ For a party to use another's statement against them, the express language of the rule and general understanding indicate that such use can only occur *between party opponents*.[18] Co-defendants in a criminal prosecution are treated as the same party for purposes of the rule. *United States v. Gossett*, 877 F.2d 901, 906 (11th Cir.1989) (*cert. denied*, 493 U.S. 1082, 110 S.Ct. 1141, 107 L.Ed.2d 1045 (1990)) ("The Government is the party opponent of both defendants."). Consequently, Appellant could not have introduced Beaumont's admissions against him for they are the same party.

Nevertheless, Appellant argues that application of hearsay rules in this instance would "mechanistically ... defeat the ends of justice" in violation of his right to due process pursuant to *Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973).[19] We find Appellant's reliance on *Chambers* inapt.

---

**18.** The relevant portions of KRE 801 A, "Prior statements of witnesses and admissions," are as follows:

> (b) Admissions of parties. A statement is not excluded by the hearsay rule, even though the declarant is available as a witness, if the statement is *offered against a party* and is:
> (1) The party's own statement, in either an individual or a representative capacity;
> (emphasis added).

**19.** Encountering similar contentions in the past, we have had occasion to summarize *Chambers:*

In *Chambers*, another person, McDonald, who was not charged with the offense, had signed a sworn confession to having committed the murder. He had also made unsworn statements to others in which he admitted being the killer. The defendant was permitted to call McDonald as a witness and to introduce the sworn, written confession. However, McDonald denied committing the murder and recanted the confession, offering a plausible explanation for having originally signed it. Under Mississippi's "voucher" rule of evidence, the defendant was prohibited from thereafter impeaching McDonald, his own witness, ei-

*Chambers'* admonishment was premised on "rejected" "testimony ... [that] bore persuasive assurances of trustworthiness" such that it "was well within the basic rationale of the exception for declarations against [penal] interest." [20] *Id.* There, the Court was confronted with a recanted "confession ... [that] was in a very real sense self-incriminatory and unquestionably against interest." *Id.* at 301, 93 S.Ct. 1038. Here, for reasons already stated, Beaumont's statement was self-exculpatory both on its face and in context and was made under circumstances indicating its unreliability. *Chambers,* therefore, does not conflict with our conclusion that the trial court did not err by excluding Beaumont's statement. *Cf. Mills v. Commonwealth,* 996 S.W.2d 473, 489 (Ky.1999) (*Chambers* "does not hold that evidentiary rules cannot be applied so as to properly channel the avenues available for presenting a defense.").

### 2. Curative Admissibility

 We reject Appellant's claim that he was entitled to introduce Beaumont's statement under the doctrine of curative admissibility, as it has no application here. Appellant argues that he was entitled to introduce Beaumont's statement as rebuttal evidence because Beaumont's defense counsel, in closing argument, argued that the 9–millimeter semi-automatic handgun Appellant testified to having used was actually a "figment of [his] imagination."

Appellant cites no authority for his argument and did not object to defense counsel's statement at trial.

 The doctrine of curative admissibility is a remedy that assumes that the trial court received inadmissible *evidence. See Norris v. Commonwealth,* 89 S.W.3d 411, 414 (Ky.2002) ("In a typical case, a witness will make an inadmissible assertion and the opposing party is then permitted to introduce evidence to the contrary."). A closing argument, on the other hand, is not a vehicle for introducing evidence, but rather a mere summary device whereby counsel "may draw reasonable inferences from the evidence and propound their explanations of the evidence and why the evidence supports their respective theories of the case." *Garrett v. Commonwealth,* 48 S.W.3d 6, 16 (Ky.2001) (*citing Tamme v. Commonwealth,* 973 S.W.2d 13, 38–39 (Ky.1998)). Accordingly, Appellant's argument is without any legal support.

### 3. Right To Present A Defense

 Finally, we are unpersuaded by Appellant's generalized argument that the trial court, in excluding Beaumont's statement, denied him his fundamental right to present a defense under *Crane v. Kentucky,* 476 U.S. 683, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986). Appellant cites many cases, but none that support his contention. The record shows that Appellant had the opportunity to testify on his own

---

ther by crossexamination or by use of his prior unsworn statements. Mississippi's hearsay rule did not permit McDonald's prior inconsistent, but unsworn, statements to be used for substantive purposes, and did not contain an exception for hearsay statements against penal interest. Thus, the defendant could not rebut McDonald's recantation of his sworn confession and was essentially prevented from presenting his best defense to the charges against him. It was held under those circumstances that "where constitutional rights directly affect-

ing the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice."

*Dillard v. Commonwealth,* 995 S.W.2d 366, 372 (Ky.1999) (internal citations omitted).

**20.** At the time, the state's law did not recognize such an exception to hearsay. *Chambers,* 410 U.S. at 299, 93 S.Ct. 1038. However, Kentucky clearly does now recognize declarations against penal interest under KRE 804(b)(3).

behalf and did so, explaining to the jury that Beaumont, and not he, shot and killed Shirley Thomas. Towards that end, Appellant stated that he possessed not a revolver, but a 9–millimeter semi-automatic handgun. Therefore, despite the exclusion of which he complains, Appellant was still able to present evidence showing that he did not possess the weapon used in the crimes. Thus, we cannot say—irrespective of our finding that no abuse of discretion occurred—that the trial court's exclusion of Beaumont's statement "significantly undermined fundamental elements of ... [his] defense" such that reversal is required. *United States v. Scheffer*, 523 U.S. 303, 315, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998).

## C. The Trial Court's Reinstatement Of The Tampering With Physical Evidence Charge Was A Violation of Double Jeopardy Because Appellant's Acquittal Was Final.

■ Finally, Appellant argues that his conviction should be reversed because the trial court, in reinstating a charge against him, placed him in double jeopardy in a violation of the Fifth and Fourteenth Amendments of the United States Constitution, as well as Section 13 of the Kentucky Constitution. We agree and, therefore, reverse Appellant's conviction for this tampering with physical evidence charge for reasons that he was acquitted of the charge by virtue of the court's earlier directed verdict.

At the close of the Commonwealth's case, Appellant moved the trial court for a directed verdict as to the tampering with physical evidence charge, arguing that it had not been supported by sufficient evidence. The Commonwealth, in response, explained that the charge related to "throwing the guns away." Unable to recall evidence as to this fact, the trial court stated that the defense motion "was sustained as it relates to the tampering with physical evidence." Appellant then proceeded with his defense.

■ At the close of the evidence, however, the Commonwealth moved the trial court "to reconsider" its prior directed verdict, arguing that the tampering indictment was "open-ended" and that they had, in fact, presented evidence that certain items—such as clothing and ski masks—had been intentionally disposed of by Appellant and Beaumont with the knowledge that they had shot someone.[21] Upon hearing the Commonwealth's motion, the trial court stated that it had not previously considered these items and that its prior ruling related only to handgun evidence. On that basis, and over Appellant's objection, the trial court reinstated the tampering charge and allowed the Commonwealth a tampering instruction as it related to the clothing and ski masks.[22] Thereafter, both Appellant and Beaumont closed their cases.

■ The Double Jeopardy Clause of the Fifth Amendment mandates that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const, amend. V; *see also* Ky. Const. § 13. We have held that the Fifth Amendment and Section 13 of the Kentucky Constitution are "identical in ... their prohibition against double jeopardy." *Jordan v. Commonwealth*, 703 S.W.2d 870, 872 (Ky.1985). In jury trials, jeopardy attaches when the jury is impaneled and sworn. *Crist v. Bretz*, 437 U.S. 28, 36, 98

---

**21.** The indictment, under KRS 524.100, was general and did not specify the underlying items of evidence.

**22.** A failure to object to a double jeopardy violation does "not constitute a waiver of the right to raise the issue for the first time on appellate review." *Gunter v. Commonwealth*, 576 S.W.2d 518, 522 (Ky.1978).

S.Ct. 2156, 57 L.Ed.2d 24 (1978); *see also Lear v. Commonwealth*, 884 S.W.2d 657, 661 (Ky.1994); KRS 505.030(4).

The Commonwealth does not contest that jeopardy attached in Appellant's trial. Rather, the issue before us concerns whether jeopardy was subsequently terminated. Specifically, Appellant argues that he was acquitted of the tampering charge when the trial court orally granted his motion for a directed verdict and, thus, its later reinstatement represented a violation of double jeopardy under the holding in *Smalis v. Pennsylvania*, 476 U.S. 140, 106 S.Ct. 1745, 90 L.Ed.2d 116 (1986). The recurring inquiry, however, is determining what exactly constitutes a court-decreed acquittal for purposes of double jeopardy.

Because an acquittal functions to terminate jeopardy, "subjecting [a] defendant to post-acquittal factfinding proceedings going to guilt or innocence violates the Double Jeopardy Clause." *Smalis*, 476 U.S. at 145, 106 S.Ct. 1745 (*citing Arizona v. Rumsey*, 467 U.S. 203, 211–212, 104 S.Ct. 2305, 81 L.Ed.2d 164 (1984)); KRS 505.030(1)(a). The established test for determining whether a trial court's ruling constitutes an acquittal depends on "whether the ruling of the judge, whatever its label, actually represents a resolution, correct or not, of some or all of the factual elements of the offense charged." *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 571, 97 S.Ct. 1349, 51 L.Ed.2d 642 (1977). The United States Supreme Court has held that a trial court's determination of the sufficiency of the evidence is tantamount to such a resolution. *See id.* at 572, 97 S.Ct. 1349.

In Kentucky, "[a] motion for a directed verdict of acquittal ... is the established procedural device for challenging the sufficiency of the evidence to support a conviction." Leslie W. Abramson, 10 *Kentucky*

*Practice, Substantive Criminal Law,* § 26:51 (2nd ed.2000); *see also Commonwealth v. Benham*, 816 S.W.2d 186, 187–188 (Ky.1991) "[T]here must be evidence of substance, and the trial court is expressly authorized to direct a verdict for the defendant if the prosecution produces no more than a mere scintilla of evidence."). Indeed, we have held that a directed verdict is equivalent to an acquittal under the law of double jeopardy. *See Commonwealth v. Mullins*, 405 S.W.2d 28, 29 (Ky. 1966); *Smith v. Massachusetts*, 543 U.S. 462, 467–468, 125 S.Ct. 1129, 160 L.Ed.2d 914 (2005) (Recognizing that state law directed "the trial judge to enter a finding of not guilty 'if the evidence is insufficient as a matter of law to sustain a conviction' ... [and][a]n order entering such a finding thus meets the definition of acquittal that our double-jeopardy cases have consistently used: It 'actually represents a resolution, correct or not, of some or all of the factual elements of the offense charged.' ").

Before we conclude whether the trial court's grant of a directed verdict in Appellant's case was an acquittal, the Commonwealth urges us to hold that the trial court's ruling was not final and, therefore, open for its reconsideration without violating double jeopardy. In support of its argument, the Commonwealth cites *Price v. Vincent*, 538 U.S. 634, 123 S.Ct. 1848, 155 L.Ed.2d 877 (2003) for the general proposition that a trial court's midtrial acquittal may be revisited and rescinded if it was not sufficiently final in nature. *See Price*, 538 U.S. at 639–642, 123 S.Ct. 1848. While that is, broadly speaking, the holding in *Price*, we must ultimately reject the Commonwealth's contention that it controls here, as *Smith* distinguished *Price* from cases such as Appellant's. Given that we have yet to construe the implications of *Smith* and how it relates to *Price*, we take this opportunity to do so.[23]

---

**23.** We are not the first state to consider

*Smith. See e.g. People v. Madison*, 176 P.3d

In *Smith*, Justice Scalia, writing for the Court, explained that the finality rule in *Price* was ultimately dependent upon the context in which the midtrial acquittal was granted. *Smith*, 543 U.S. at 471, 125 S.Ct. 1129. Specifically, *Smith* held that *Price* stands for the idea that "midtrial acquittals are tentative in a case where reconsideration of the acquittal *occurred at a stage in the trial where the defendant's justifiable ignorance of the rule could not possibly have caused him prejudice.*" *Smith*, 543 U.S. at 471, 125 S.Ct. 1129 (emphasis added); *see also Price*, 538 U.S. at 643, 123 S.Ct. 1848 ("[N]o trial proceedings took place with respondent laboring under the mistaken impression that he was not facing the possibility of conviction for the purportedly acquitted charge.").[24] The distinction between *Price* and the Appellant's case, therefore, is a temporal one and it carries great weight under the protections of the Double Jeopardy Clause of the Fifth Amendment: whether an apparently final midtrial acquittal occurred before or after a defendant's presentation of his case.

In *Smith*, the Court confronted a very similar situation mirroring Appellant's. *See Smith*, 543 U.S. at 469, 125 S.Ct. 1129 ("[W]e must turn to the more difficult question whether the Double Jeopardy Clause permitted [the trial court] to reconsider that acquittal once petitioner and his codefendant had rested their cases."). There, petitioner Smith was tried before a jury on a three-count indictment relating to an alleged assault. *Id.* at 464, 125 S.Ct. 1129. The third charge was for unlawful possession of a firearm, requiring proof that the "weapon had a barrel less than 16 inches' in length." *Id.* At the close of the prosecution's case-in-chief, Smith "moved for a required finding of not guilty" on the count "because the Commonwealth had not proved that the gun barrel was less than 16 inches." *Id.* at 465, 125 S.Ct. 1129. Out of the presence of the jury and after considering the prosecution's argument, the trial court granted Smith's motion, explaining that the prosecution had not presented a "scintilla of evidence" that Smith "possessed a weapon with a barrel length of less than 16 inches." *Id.* The "trial court then marked [Smith's] motion with

---

793 (Colo.Ct.App.2007); *State v. Kramer*, 760 N.W.2d 190 (Iowa 2009); *Towery v. State*, 262 S.W.3d 586 (Tex.App.2008).

**24.** In explaining how an application of *Price* would prejudice a defendant in Appellant's situation, the Court observed:

> But when, as here, the trial has proceeded to the defendant's presentation of his case, the possibility of prejudice arises. The seeming dismissal may induce a defendant to present a defense to the undismissed charges when he would be better advised to stand silent. Many jurisdictions still follow the traditional rule that after trial or on appeal, sufficiency-of-the-evidence challenges are reviewed on the basis of the *entire* trial record, even if the defendant moved for acquittal when the prosecution rested and the court erroneously denied that motion. In these jurisdictions, the defendant who puts on a case runs "the risk that ... he will bolster the Government

> case enough for it to support a verdict of guilty." The defendant's evidence "may lay the foundation for otherwise inadmissible evidence in the Government's initial presentation or provide corroboration for essential elements of the Government's case." In all jurisdictions, moreover, false assurance of acquittal on one count may induce the defendant to present defenses to the remaining counts that are inadvisable—for example, a defense that entails admission of guilt on the acquitted count.

*Smith*, 543 U.S. at 471–472, 125 S.Ct. 1129 (internal citations omitted); *cf. United States v. Byrne*, 203 F.3d 671, 674 (9th Cir.2000) ("[T]here was no announcement of the court's decision to the jury, and the trial did not resume until after the court had denied the defendant's motion."). Pursuant to *Sawhill*, we, indeed, review the denial of a directed verdict from "*the evidence as a whole.*" *Commonwealth v. Sawhill*, 660 S.W.2d 3 (Ky. 1983) (emphasis added).

the handwritten endorsement 'Filed and after hearing, Allowed,' and the allowance of the motion was entered on the docket." *Id.* The jury had no knowledge of the acquittal. *Id.*

Immediately thereafter, Smith presented his defense and closed his case. *Id.* However, "[d]uring a short recess before closing arguments, the prosecutor brought to the [trial] court's attention a [state] precedent under which (he contended)" the evidence was sufficient to support the firearm possession charge. *Id.* The prosecution, therefore, "requested that the [trial] court defer ruling on the sufficiency of the evidence until after the jury verdict." *Id.* The trial court agreed, "announcing orally that [it] was 'reversing' [its] previous ruling and allowing the firearm-possession count to go to the jury." *Id.* "Corresponding notations were made on the original of [Smith's] motion and on the docket." *Id.* at 465–466, 125 S.Ct. 1129. Smith was convicted on all counts. *Id.* at 466, 125 S.Ct. 1129.

Upon a grant of certiorari, the United States Supreme Court reversed the decision of the Appeals Court of Massachusetts, which had initially affirmed Smith's convictions, holding that Smith's initial midtrial acquittal was final. *Id.* at 466–475, 125 S.Ct. 1129. The Court observed "at the outset, that the facts of [his] case gave [Smith] no reason to doubt the finality of the state court's ruling," as "[t]he prosecutor did not make or reserve a motion for reconsideration, or seek a continuance that would allow him to provide the court with favorable authority." *Id.* at 470, 125 S.Ct. 1129. "Rather, the sidebar conference concluded, the court asked the prosecutor if he had 'any further evidence,' and he replied, 'No. At this point, the Commonwealth rests their case.'" *Id.* In addition, the Court noted that neither did "the [trial] court's ruling appear on its face to be tentative ... as [it] ... was not permitted by Massachusetts procedure to defer ruling on [Smith's] motion ... or to require the defendants to go forward with their cases while the prosecution reserved the right to present more evidence." *Id.*

Ultimately concluding that the trial court's reinstatement of the charge against Smith constituted a violation of double jeopardy, the Court in *Smith* warned, "[t]he Double Jeopardy Clause's guarantee cannot be allowed to become a potential snare for those who reasonably rely upon it." *Id.* at 473, 125 S.Ct. 1129. With that principle in mind, *Smith* set forth the rule that an "acquittal must be treated as final" "[i]f, after a facially unqualified midtrial dismissal of one count, the trial has proceeded to the defendant's introduction of evidence."[25] *Id.* Such a finding, *Smith* concluded, is always appropriate "*unless* the availability of reconsideration has been plainly established by pre-existing rule or case authority expressly applicable to midtrial rulings on the sufficiency of the evidence." *Id.* (emphasis added).

Applying this rule to Smith's underlying trial, the Court concluded that the rule's exception "had not been met" because the government had "failed to show that ... the trial court's ruling on the motion for a required finding of not guilty was automatically, or even presumptively, nonfinal." *Id.* Rather, and "[a]t most," the government had merely "shown that the ruling was wrong because the Commonwealth's

---

**25.** The majority in *Smith* expressly rejected the dissent's contention that actual prejudice must be shown in order to constitute a double jeopardy violation and, instead, adopted a rule of presumed prejudice in these instances: "[r]equiring someone to defend against a charge of which he has already been acquitted is prejudice *per se* for purposes of the Double Jeopardy Clause-even when the acquittal was erroneous because the evidence was sufficient." *Smith*, 543 U.S. at 473 n. 7, 125 S.Ct. 1129 (*citing Sanabria v. United States*, 437 U.S. 54, 77–78, 98 S.Ct. 2170, 57 L.Ed.2d 43 (1978)).

evidence was, as a matter of law, sufficient." *Id.* That, according to *Smith,* was not good enough: "any contention that the Double Jeopardy Clause must itself (absent a provision by the State) leave open a way of correcting errors is at odds with the well-established rule that the bar will attach to a preverdict acquittal that is patently wrong in law." *Id.* (*citing Smalis,* 476 U.S. at 144, 106 S.Ct. 1745; *Sanabria v. United States,* 437 U.S. 54, 68–69, 98 S.Ct. 2170, 57 L.Ed.2d 43 (1978); *Martin Linen,* 430 U.S. at 571, 97 S.Ct. 1349; *Fong Foo v. United States,* 369 U.S. 141, 143, 82 S.Ct. 671, 7 L.Ed.2d 629 (1962)).

Returning to the case at bar, Appellant had no reason to doubt the finality of the trial court's oral grant of his motion for a directed verdict on the tampering charge. After considering the Commonwealth's response that the charge related to gun evidence, the record reveals that the trial court stated that Appellant's motion was "sustained as it relates to the tampering with physical evidence" and the Commonwealth did not indicate in any way that it would make or reserve a motion for reconsideration or that it would seek a continuance on the basis of the trial court's ruling. *See Martin Linen,* 430 U.S at 571, 97 S.Ct. 1349 ("What constitutes an 'acquittal' is not to be controlled by the form of the judge's action," but rather the inquiry turns on whether the trial court's oral grant of Appellant's motion was "a resolution, correct or not, of some or all of the factual elements of the offense charged."). For the trial court to then reinstate the Appellant's charge after he had presented his defense would be an affront to his

reasonable confidence in the finality of the trial court's initial ruling and to hold otherwise, as *Smith* observes, would be an invitation for the prejudice of an accused.[26]

The Commonwealth, however, directs our attention to *Allen v. Walter* for the proposition that the finality of a court-decreed acquittal depends upon whether the trial court formalized its ruling in the form of a signed order. *See* 534 S.W.2d 453 (Ky.1976).[27] Yet, we must reject the idea that the common law concept in *Allen* applies to midtrial, court-decreed acquittals because similar doctrines were both recognized and distinguished by the Court in *Smith,* 543 U.S. at 471, 125 S.Ct. 1129 ("It may suffice for an appellate court to announce the state-law rule that midtrial acquittals are tentative in a case where reconsideration of the acquittal occurred at a stage in the trial where the defendant's justifiable ignorance of the rule could not possibly have caused him prejudice."); *cf. Price,* 538 U.S. at 643 n. 2, 123 S.Ct. 1848 (*citing e.g. United States v. LoRusso,* 695 F.2d 45, 54 (2nd Cir.1982), *United States v. Byrne,* 203 F.3d 671, 674 (9th Cir.2000)).

This, however, is not to say that *Smith* completely forbids a trial court's reconsideration of a relied-upon mid-trial acquittal. *Smith* simply envisions something far more specific and intentional than the general doctrine in *Allen:* where "the availability of reconsideration has been plainly established by pre-existing rule or case authority expressly applicable to midtrial rulings on the sufficiency of the evidence." *Smith,* 543 U.S. at 473, 125 S.Ct. 1129. We find no such rule in Kentucky. Accordingly, we hold that the trial court's

**26.** We note that Appellant, in his defense presentation, admitted to have thrown away both a gun and ski mask in the park. The Commonwealth, in its subsequent efforts to reinstate the tampering charge, noted this admission as support for its argument. This tactic, quite clearly, is that which was contemplated and prohibited by *Smith.*

**27.** There, we held that "[i]t is elementary that a court of record speaks only though its records" and "[a]n order is not an order until it is signed." *Allen,* 534 S.W.2d at 455. Until that point, the Commonwealth argues, "the judge can change his mind and not enter [the order]." *Id.*

subsequent reinstatement of the tampering charge and its instruction to the jury was a violation of the Double Jeopardy Clause of the Fifth Amendment as it represented "postacquittal factfinding proceedings going to" Appellant's "guilt or innocence." *See Smalis,* 476 U.S. at 145, 106 S.Ct. 1745.

### III. *Conclusion*

Therefore, for the above stated reasons, Appellant's conviction for tampering with physical evidence is reversed and remanded to the Jefferson Circuit Court for further proceedings in accordance with this opinion. All of Appellant's further convictions are affirmed.

All sitting. All concur.