Richard Allen MEREDITH, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

No. 2002–SC–0741–MR.

Supreme Court of Kentucky.

May 19, 2005.

J. Bart Adams, Louisville, Counsel for Appellant.

Gregory D. Stumbo, Attorney General, Janine Coy Bowden, Assistant Attorney General, Frankfort, Counsel for Appellee.

Opinion of the Court by Justice GRAVES.

Appellant, Richard Allen Meredith, was convicted in the Jefferson Circuit Court of complicity to commit murder and complicity to commit first-degree robbery. His convictions stemmed from an incident that took place at Harold's Hubcaps in Louis-

ville, Kentucky, in November 2000. Specifically, the jury found that Appellant was involved in the robbery and shooting death of the establishment's owner, Harold Smith.

During the course of the investigation, the police received an anonymous tip that a Michael Crain had been involved in the crimes. When police ultimately attempted to confront Crain, he pulled a gun and fled. At some point during the pursuit, Crain was shot and killed. There is some indication from the record that Crain's gunshot wounds were self-inflicted. Following Crain's death, police received information that Appellant also may have been involved in the crimes. Appellant was subsequently indicted on charges of complicity to commit murder and complicity to commit first-degree robbery.

Following the guilt phase of trial, Appellant waived formal sentencing and accepted the Commonwealth's recommendation of life without the possibility of parole for twenty-five years on the murder charge and twenty years imprisonment on the robbery charge, to run concurrently. Judgment was entered accordingly. He appeals to this Court as a matter of right.

Appellant argues that the Commonwealth's evidence against him on either charge was insufficient to survive a directed verdict. For the reasons below, we find sufficient evidence in the record to sustain Appellant's convictions on both charges.

I. Complicity—First–Degree Robbery

(1) A person is guilty of robbery in the first degree when, in the course of committing theft, he uses or threatens the immediate use of physical force upon another person with intent to accomplish the theft and when he:

(a) Causes physical injury to any person who is not a participant in the crime; or

(b) Is armed with a deadly weapon; or

(c) Uses or threatens the immediate use of a dangerous instrument upon any person who is not a participant in the crime.

KRS 515.020. Furthermore, under certain circumstances, a person is guilty of an offense committed by someone else. KRS 502.020 provides:

(1) A person is guilty of an offense committed by another person when, with the intention of promoting or facilitating the commission of the offense, he:

(a) Solicits, commands, or engages in a conspiracy with such other person to commit the offense; or

(b) Aids, counsels, or attempts to aid such person in planning or committing the offense; or

(c) Having a legal duty to prevent the commission of the offense, fails to make a proper effort to do so.

(2) When causing a particular result is an element of an offense, a person who acts with the kind of culpability with respect to the result that is sufficient for the commission of the offense is guilty of that offense when he:

(a) Solicits or engages in a conspiracy with another person to engage in the conduct causing such result; or

(b) Aids, counsels, or attempts to aid another person in planning, or engaging in the conduct causing such result; or

(c) Having a legal duty to prevent the conduct causing the result, fails to make a proper effort to do so.

Section one addresses "complicity to the act," while section two addresses "complicity to the result." "Complicity to the act" requires the Commonwealth to prove that

the accomplice intended for the principal actor to commit the criminal act. "Complicity to the result" requires only "a state of mind which equates with 'the kind of culpability with respect to the result that is sufficient for the commission of the offense,' whether intent, recklessness, wantonness, or aggravated wantonness." *Tharp v. Commonwealth*, 40 S.W.3d 356, 360 (Ky.2001), *cert. denied*, 534 U.S. 928, 122 S.Ct. 289, 151 L.Ed.2d 213 (2001).

■ Appellant urges that the evidence against him was insufficient to permit a jury to reasonably find that he had any knowledge of Crain's intent to commit the robbery. We disagree. Though the evidence against Appellant is circumstantial, his intent can be "inferred from the act and surrounding circumstances." *Commonwealth v. Suttles*, 80 S.W.3d 424, 426 (Ky.2002).

During the eight-day trial, the Commonwealth presented numerous witnesses. Samantha Green and Barbara Ferguson testified that they were eating at a Dairy Queen across from Harold's Hubcaps on the afternoon in question, when Crain and another man entered the restaurant. Samantha stated that she knew Crain because he was her cousin's boyfriend. Both women testified that the two men left the restaurant and crossed the street to Harold's Hubcaps. Shortly thereafter, the women observed the men leave Harold's Hubcaps, get into a red Ford Tempo and speed away. Neither woman thought anything was wrong until they each saw the subsequent news stories. While the women positively identified Crain from a photo line-up, neither was able to identify Appellant as the second perpetrator.

Brian Davis, Ashley Meyer, and Steve Craven all testified that on December 1, 2000, the date of Crain's death, Appellant arrived at Davis' home around 10:00 p.m., where the three men were watching television. Following a news story concerning Crain, Appellant admitted that he was the one who drove Crain to Harold's Hubcaps on the day of the crimes. Myers testified that Appellant told him that he had previously observed Smith with a lot of money and tried to "gas his [Crain's] head up." Myers clarified that "gas his head up" basically meant talk him into it [the robbery].

Appellant told the three men that he dropped Crain off at Harold's Hubcaps and gave him a spare cell phone. However, Crain quickly left the premises because there was a uniformed police officer purchasing a hubcap from Smith at the time. Appellant stated that he once again drove Crain back to Harold's Hubcaps a short time later so that Crain could rob the store.

Evidently, after Crain found only $14 in the cash register, he and Smith had an altercation and Smith attempted to run away. Crain then shot Smith twice and called Appellant on his other cell phone to pick him up. Brian Davis testified that Appellant said Crain had stolen several Indian figurines from the store before leaving. In addition, all three men testified that Appellant owned a red Ford Tempo.

Jefferson County Police Detective Marcie Davis, the lead investigator, testified that when she went to Appellant's house to interview his girlfriend, she observed a curio cabinet containing several Indian figurines. Detective Davis also confirmed that Appellant owned a red 1990 Ford Tempo. Davis testified that Appellant's cell phone records showed that he, in fact, owned two separate phones. On the afternoon of November 22, 2000, the records indicated several phone calls between the two phones. Detective Davis then recounted her interview with Appellant, stat-

ing that he denied any involvement in the robbery or murder. Yet when asked if he ever discussed the crimes with anyone else, he responded that all he knew was that he was getting some money out of it for food and gas.

Sergeant Jerry Bennett testified that he stopped in Harold's Hubcaps around 1:00 p.m. on November 22, 2000. Sergeant Bennett noted that there was a suspicious man in the store, whom he later identified from a photo line-up as being Michael Crain. Sergeant Bennett recounted that Harold Smith had expressed concern about the safety of his business and had requested extra patrol.

Lisa Fusting testified that she lived with Crain from September 2000 until December 2000. She stated that she knew Crain owned a gun and, in fact, had shot himself in the leg, resulting in a limp when he walked. Fusting testified that on the afternoon of November 22, 2000, Appellant came to the Archway Motel to pick up Crain. Fusting stated that she later called Meredith's cell phone and spoke with Crain. The two men returned to the motel later that evening.

Appellant neither took the stand in his own defense, nor presented any alibi witnesses to refute the Commonwealth's evidence.

Collectively, the evidence showed that on the day of the robbery Appellant picked up Crain at a motel, dropped him off at Harold's Hubcaps and gave him a spare cell phone. Crain answered Appellant's spare cell when Fusting called it. Cell phone records indicated several phone calls between Appellant's cell and the spare cell that afternoon.

On the day of the crimes, Ms. Ferguson and Ms. Green saw Crain and another man in Dairy Queen and observed them exit the restaurant and cross the street towards Harold's Hubcaps. A few moments later, the two women saw both men running towards, and then speed away in, a red Ford Tempo, the type of car Appellant owned. The pistol that the police recovered from Crain is the one that fired the spent casings found at Harold's Hubcaps.

Additionally, Detective Davis observed several Indian figurines at Appellant's home when interviewing his girlfriend. Appellant had previously told Detective Davis that Crain had stolen some Indian figurines during the robbery. Finally, Appellant gave Detective Davis conflicting answers about being involved in the crimes.

We conclude that the evidence was sufficient for a jury to reasonably find that Appellant provided Crain transportation to and from Harold's Hubcaps with the intention of promoting or facilitating the offense of first-degree robbery. KRS 502.020(1); KRS 515.020. As such, the trial court did not err in refusing to grant a directed verdict on the robbery charge. *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky.1991).

## II.  Complicity—Murder

Appellant asserts that the Commonwealth failed to present any evidence that he was aware that Crain owned or possessed a gun at the time of the offenses. Accordingly, his conduct cannot rise to the level of "wantonness" manifesting an extreme indifference to human life as required by KRS 507.020(2).

The former felony murder doctrine allowed a participant in a dangerous felony to be convicted of a murder committed by his or her co-conspirator during the commission of the felony. It permitted a murder conviction regardless of the participant's specific intent, or lack thereof, for the principal to commit the homicide. The doctrine required only the intent to partici-

pate in the underlying felony, and "created an almost strict liability with respect to murder committed during its commission." *Bennett v. Commonwealth*, 978 S.W.2d 322 (Ky.1998) (quoting R. Lawson and W. Fortune, *Kentucky Criminal Law*, § 8–2(d)(1)).

However, Kentucky's adoption of the Model Penal Code abrogated the felony murder doctrine as an independent basis of liability. Kentucky's murder statute states in pertinent part:

(1) A person is guilt of murder when:

    (a) With intent to cause the death of another person, he causes the death of such person or of a third person; ... or;

    (b) Including, but not limited to, the operation of a motor vehicle under circumstances manifesting extreme indifference to human life, he wantonly engages in conduct which creates a grave risk of death to another person and thereby causes the death of another person.

KRS. 507.020.

In *Kruse v. Commonwealth*, 704 S.W.2d 192, 195 (Ky.1985), this Court examined the interplay between KRS 507.020 and KRS 502.020 in circumstances which would have been governed by the former felony murder doctrine. We explained that the culpability for someone in Appellant's position "must now be measured by the degree of wantonness or recklessness reflected by the extent of his participation in the underlying robbery."

Specifically, the Commentary to KRS. 502.020 states in part:

Special mention should be made of the problem of imputing liability from one person to another because of the existence of a criminal conspiracy. The pre-existing law is difficult to ascertain and describe. It is clear that if multiple parties conspired to commit an offense and one of them committed it, all were equally responsible for the offense. Complicity of this type is now covered by subsection (1) since all of the conspirators intended to promote the offense committed. If one of the conspirators departs from the scope of the conspiracy and commits an offense not contemplated by the conspiratorial agreement, the problem is much more difficult. Previous existing liability in this situation was governed by this principle:

[W]hen individuals associate themselves in an unlawful enterprise, an act done by one in pursuance of a conspiracy is the act of all and extends to such results as are the natural and probable consequences of such act, even though such consequences were not specifically intended as a part of the original plan.

In an effort to further clarify the circumstances under which liability could be imputed from one conspirator to another the Court had said that "natural and probable consequences" are those which "should have been necessarily and reasonably anticipated" in the completion of the conspiratorial objective.

In virtually every case involving these principles, the Court has been concerned with imputing liability for murder to all participants of a conspiracy which had as its objective the commission of another felony, usually robbery, burglary or arson. In a few cases, the Court imposed criminal liability in this situation because of the existence of the conspiracy. In doing so, it never clearly stated the relationship of the "conspiracy" doctrine to the "felony murder" doctrine. In this Code a different approach to the problem is taken, one that achieves the same result as is achieved under pre-existing law but without the difficulty

that previously existed in the law. A defendant's liability for a death which occurs under these circumstances is governed by the provisions of the homicide chapter (KRS Ch 507). The following example serves to demonstrate: D agrees with another person to commit an armed robbery. During the course of this robbery a third person is killed by D's cohort. If D and his co-conspirator had agreed as part of the conspiracy to kill anyone interfering with the endeavor, he could be convicted under subsection (1) on intentional murder. In the absence of such an agreement his liability must depend upon what the decision makers find his state of mind to have been with regard to the resulting death. If, from all of the circumstances, they find that he acted with wantonness manifesting extreme indifference to human life, he is guilty under KRS 507.020(1)(b) of murder. (Citations omitted).

Additionally, the Commentary to KRS 507.020 states in pertinent part:

> KRS 507.020 ... abandon[s] the doctrine of felony murder as an independent basis for establishing an offense of homicide. Under the section, deaths occurring in the course of other felonies must be judged under the "intentional" and "wantonness with extreme indifference" provisions of KRS 507.020(1)(a) and (b) and the "wantonness" provision of KRS 507.040. Thus, if a defendant intentionally commits an act of killing during a felony his guilt is to be determined under KRS 507.020(1)(a). If a felony participant other than the defendant commits an act of killing, *and if a jury should determine from all the circumstances surrounding the felony that the defendant's participation in that felony constituted wantonness manifesting extreme indifference to human life, he is guilty of murder under KRS 507.020(1)(b).* (Emphasis added).

In the instant case, the trial court instructed the jury on both theories of liability. We find sufficient evidence in the record to support Meredith's conviction for wanton murder. "[T]he facts proving the element of endangerment necessary to convict of first-degree robbery may be the same facts which prove the element of aggravated wantonness necessary to convict of wanton murder." *Bennett, supra,* at 327.

For a conviction of wanton murder under KRS. 507.020(b),

> The conduct in question must have involved a substantial and unjustifiable risk of death to human life; the defendant, in causing the death in question, must have consciously disregarded that risk, and his disregard must have constituted "a gross deviation from the standard of conduct that a reasonable person would [have observed] in the situation." Taken together, these three elements constitute the culpable mental state defined in KRS 501.020 as "wantonness," .... If accompanied by a fourth element, i.e., "circumstances manifesting an extreme indifference to human life," they are sufficient for a conviction of murder.

KRS 507.020, Commentary (1974).

Appellant provided Crain with transportation as well as a cell phone for communication. After Crain was unable to go through with the first attempt because of a police officer's presence in the store, Appellant drove him back a second time. Several witnesses testified that Crain had owned guns all his life. Meyer testified that Crain had attempted to sell him a gun in Appellant's presence. Craven's testimony revealed that Appellant had seen Harold Smith with a lot of money, told Crain about it, and tried to talk him into the

robbery. Finally, the pistol the police recovered from Crain is the one that fired the spent casings found at Harold's Hubcaps.

It was certainly reasonable for the jury to determine from the evidence that Appellant's participation in the robbery constituted the wantonness required for a murder conviction under KRS 507.020(2). *Bennett, supra; Kruse, supra.*

### III. Admissibility of child-support arrearage

■ Prior to trial, the Commonwealth filed a KRE 404(c) notice of its intent to introduce evidence of Appellant's child-support arrearage as a motive for the robbery. The trial court overruled his objection, but held that pursuant to *Brown v. Commonwealth*, 983 S.W.2d 513 (Ky.1999), only statements that Appellant needed money to pay his child support obligation were admissible; specifics of any child support proceedings were not admissible. Accordingly, several Commonwealth witnesses testified at trial that Appellant was having difficulty paying his child support and needed money. He now alleges that such evidence, in light of what he considers "a scant level of proof" that he participated in the robbery and murder, was unduly prejudicial. We disagree.

■ This case is analogous to *Tucker v. Commonwealth*, 916 S.W.2d 181, 184 (Ky. 1996), wherein we held that proof of the defendant's child support arrearage was admissible to demonstrate his motive to commit robbery. Further, like the instant case, the defendant in *Tucker* neither objected to the challenged testimony nor requested an admonition. Here, defense counsel appeared satisfied with the trial court's exclusion of any evidence pertaining to the child support proceedings. No further objection was raised and, as such, we conclude the issue was not properly

preserved for review. RCr 9.22. Notwithstanding, the evidence was properly within the scope of KRE 404(b), and was relevant and probative of Appellant's motive for the robbery. No error occurred.

Accordingly, the judgment and sentence of the Jefferson Circuit Court for Appellant's convictions of complicity to first-degree robbery as well as complicity to murder are affirmed.

COOPER, GRAVES, KELLER, SCOTT, and WINTERSHEIMER, J.J. concur.

JOHNSTONE, J., concurs in part and dissents in part in a separate opinion in which LAMBERT, C.J., joins.

Opinion by Justice JOHNSTONE, concurring in part and dissenting in part.

Although I concur with that part of the Majority's opinion affirming Appellant's conviction for complicity to commit first-degree robbery, I respectfully dissent as to the conviction for complicity to commit murder.

Because there is no evidence that Crain had any prior intent of shooting Smith, and in fact did so only after the two had an altercation, the intent to cause Smith's death cannot be imputed to Appellant. Thus, the complicity to commit murder charge must be pursuant to KRS 502.020(2), the "complicity to the result" theory. As noted in *Tharp v. Commonwealth*, 40 S.W.3d 356, 360 (Ky.2000), *cert. denied*, 534 U.S. 928, 122 S.Ct. 289, 151 L.Ed.2d 213 (2001):

[A] person can be guilty of "complicity to the act" under KRS 502.020(1) only if he/she possesses the *intent* that the principal actor commit the criminal act. However, a person can be guilty of "complicity to the result" under KRS 502.020(2) without the intent that the

principal's act cause the criminal result, but with a state of mind which equates with "the kind of culpability with respect to the result that is sufficient for the commission of the offense," whether intent, recklessness, wantonness, or aggravated wantonness. KRS 502.020 (1974 Official Commentary); R. Lawson and W. Fortune, *Kentucky Criminal Law* § 3–3(b)(3), at 106, § 3–3(c)(2), at 114 (Lexis 1998).

Nonetheless, the trial court's instruction set forth both theories of liability:

You will find the defendant, RICHARD ALLEN MEREDITH, guilty of Murder (Complicity), under this instruction if, and only if, you believe from the evidence beyond a reasonable doubt, all of the following:

A. That in this county on or about the 22nd day of November, 2000, acting alone or in complicity, he caused the shooting death of Harold Smith;

AND

B. That in so doing:

(1) He intentionally caused the death of Harold Smith;

OR

(2)(a) He voluntarily participated in the commission of a theft, or attempted theft, knowing that another person would be threatened with a deadly weapon during the course of that theft;

AND

(b) During the course of the theft or attempted theft, and as a result thereof, Harold Smith was shot and killed;

AND

(c) By participating in the theft, this defendant was wantonly engaging in conduct which created a grave risk of death or serious physical injury to another and thereby caused the death of Harold Smith under circumstances manifesting an extreme indifference to the value of human life.

Notably, even the second theory of liability, *i.e.* complicity to the result, required the jury to believe that Appellant participated in the commission of a theft *knowing* that Smith "would be threatened with a deadly weapon." Thus, by virtue of the trial court's instruction, the Commonwealth was required to prove that Appellant, acting alone or in complicity with Crain, either intentionally caused the death of Smith, or was aware that Crain would be armed with a deadly weapon during the course of the theft. There is no evidence in the record to support either theory.

Citing *Bennett v. Commonwealth*, 978 S.W.2d 322 (Ky.1998) and *Kruse v. Commonwealth*, 704 S.W.2d 192 (Ky.1986), the Majority opines that Appellant's culpability in Smith's death can be determined from the wantonness evidenced by his participation in the underlying robbery. However, I find the Majority's reliance on *Bennett* and *Kruse* misplaced as both cases concerned defendants who actively participated in all aspects of the respective crimes and had specific knowledge that the other participant possessed a weapon. In fact, the defendant in *Bennett* supplied the weapon that his cohort used to kill the victim. 978 S.W.2d at 324. In the instant case, while the Commonwealth makes reference to several witnesses having knowledge that Crain owned a gun, at no point is it asserted that Appellant knew Crain owned a gun, much less that he was armed at the time of the robbery.

The Commentary to § 2.06 [1] of the *Model Penal Code* provides:

1. "KRS 502.020(2) is modeled after what be-    came Section 2.06(4) of the Model Penal

[C]omplicity in conduct causing a particular criminal result entails accountability for that result so long as the accomplice is personally culpable with respect to the result to the extent demanded by the definition of the crime. Thus, if the accomplice recklessly endangers life by rendering assistance to another, he can be convicted of manslaughter if a death results, even though the principal actor's liability is at a different level.

*Model Penal Code* Pt. I § 2.06 Comment, at 321 (1985). Because Appellant was charged with complicity to commit murder, the jury had to find that he either acted intentionally with respect to Smith's death or acted under circumstances manifesting an extreme indifference to human life:

[T]he conduct in question must have involved a substantial and unjustifiable risk of death to human life; the defendant, in causing the death in question, must have consciously disregarded that risk, and his disregard must have constituted "a gross deviation from the standard of conduct that a reasonable person would [have observed] in the situation." Taken together, these three elements constitute the culpable mental state defined in KRS 501.020 as "wantonness," and without more, will suffice for a conviction of manslaughter in the second degree. If accompanied by a fourth element, i.e., "circumstances manifesting extreme indifference to human life," they are sufficient for a conviction of murder.

KRS 507.020, Commentary (1974).

The evidence at trial that Appellant provided Crain with transportation and a cell phone was certainly sufficient to support his conviction for complicity to commit first-degree robbery, and would likely have constituted the "wantonness" sufficient for a manslaughter conviction. However, in the absence of *any* evidence that Appellant was aware Crain possessed a deadly weapon at the time of the robbery, I do not believe that Appellant's conduct rose to a level manifesting an extreme indifference to the value of human life so as to sustain a conviction for murder. *Brown v. Commonwealth,* 975 S.W.2d 922 (Ky.1998); *Johnson v. Commonwealth,* 885 S.W.2d 951 (Ky.1994).

Accordingly, I would reverse Appellant's conviction for complicity to commit murder.

LAMBERT, C.J., joins this opinion concurring in part and dissenting in part.