Tywan BEAUMONT, Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

No. 2007–SC–000486–MR.

Supreme Court of Kentucky.

May 21, 2009.

As Modified on Denial of Rehearing
Oct. 1, 2009.

Daniel T. Goyette, Louisville Metro Public Defender, Cicely Jaracz Lambert, Assistant Appellate Defender, Louisville, KY, for appellant.

Jack Conway, Attorney General, Susan Roncarti Lenz, Assistant Attorney General, Frankfort, KY, for appellee.

## OPINION OF THE COURT

On June 5, 2007, Appellant, Tywan Beaumont, was found guilty by a Jefferson Circuit Court jury and convicted of complicity to murder, complicity to robbery in the first degree, complicity to assault in the second degree, and complicity to tampering with physical evidence. For these crimes, Appellant was sentenced to fifty (50) years imprisonment. Appellant now appeals his conviction as a matter of right. Ky. Const. § 110(2)(b).

## I. BACKGROUND

On December 8, 2004, Phillip Thomas was living with his mother, Shirley Thomas, and his wife, Jutta Whitlow, on Camden Avenue in Jefferson County. Jutta was a freshman in college at the time and had just finished her last day of school for the semester. Earlier in the evening, Phillip had taken her out for dinner and then dropped her off at the house by herself. Phillip had recently started his own entertainment company and, at approximately 9:00 p.m. that night, left his home for a business meeting in Shively (an apartment complex), near Ramser Court. Shirley Thomas had been at a church meeting and choir practice that night and did not arrive home until later in the evening.

In December of 2004, Jamilah McNeely lived in an apartment complex on Ramser Court in Shively. Jamilah had known Appellant for three to four years and they had a child together. She had known Appellant's friend, Christian Walker, for about the same amount of time that she had known Appellant. She recalled that on the evening of December 8th, Appellant and Walker picked her up from work at about 8:00 p.m. Walker, driving Appellant's car, dropped both her and Appellant off at her apartment and then left.[1] Not long after Appellant had gone inside to lie down and rest, Walker returned and Appellant, hearing the car horn, left with him.

Meanwhile, Phillip's business meeting ended and he returned home to Camden Avenue between 9:30 and 9:45 p.m., just a few minutes after his mother, Shirley, had returned from choir practice. Arriving at his house, Phillip parked his car in the backyard. As Phillip was about to exit his car, he noticed in the rearview mirror a person "flash" by. The man, armed with a handgun and wearing a ski mask, jumped over the trunk of Phillip's car and immediately pointed the gun at Phillip's face.[2] Phillip, still seated inside the car, then noticed another man pacing back and forth at the side of the house. He was also armed with a handgun and wearing a ski mask.[3] Both men began yelling at Phillip and demanding that he give them his money and any drugs he had. The first gunman threatened to kill Phillip if he did not

---

1. Walker was wearing a black jacket over several layers of different colored t-shirts. Appellant was wearing blue jeans, a brown hoodie sweatshirt, and brown boots.

2. Phillip testified that the man was tall and thin, armed with a "cowboy" gun or a revolver.

3. The second man was shorter and about Phillip's height, carrying what Phillip described as a "flat gun" or a semi-automatic handgun.

comply. Phillip, however, only had $4.00, prompting the gunmen to begin rifling through his pants pockets.

At this point, Jutta, who was inside the house, heard Phillip turn off his car engine. Though he did not sound panicked, he called her name twice. Jutta walked into the kitchen and looked out the window over the sink. She saw Phillip, now outside the car, and a taller man standing behind him.[4] Jutta then opened the kitchen door to better see what was going on. As she did so, the taller man immediately turned around and shot Jutta, hitting her in the upper left groin.

Phillip testified that immediately after the taller man had shot Jutta, the gunman ran around the side of the house toward the front yard and yelled, "Come on!" At some point after that the shorter gunman left, also running around the house toward the front yard. Jutta, bleeding, made her way to the front of the house where she met Shirley between the kitchen and the living room. In an effort to escape without further injury, Shirley grabbed a cordless phone, and Jutta held Shirley's arm while they ran toward the front door.

Adam McMillan lived two houses down from the Thomas house and on the night of December 8, 2004, heard shouting from the alley. As he walked towards the door, he heard a gunshot. He saw two men in black jackets standing on the driver's side of a car yelling for money. Adam could hear one of the gunman say, "Give me the fucking money!" In response, he heard someone else say, "Calm down, I'm giving you the money." Wanting to protect himself, Adam ran through the house and out the front door to get his pistol from his truck.[5]

While Adam was at his truck, he saw an African American man in a dark jacket running towards him and getting in a parked car. The man, who Adam estimated to be about 6' 3", jumped into the car, backed it down Camden Avenue, and drove away. Then, as Adam was putting a shell in the chamber of his gun, he heard two more gunshots. As he looked up at the Thomas house, Adam saw a shorter gunman running straight toward him. Believing that the gunman was raising a weapon toward him, Adam shot twice at the man, hitting him in the shoulder. As the man ran away between two houses and toward the backyard of Phillip's house, Adam spotted Jutta step off the front porch with blood on her leg. He also saw Shirley Thomas lying on her back on the porch.

During this time, Phillip, who had remained in his car, heard a gunshot being fired from the front of the house. The shorter gunman then came back on the opposite side of the house, firing his gun at Phillip before fleeing down an alley. The bullet missed Phillip, hitting the tire of his car. Phillip stayed in the car three to four seconds and then ran to the front of the house to see what had happened. When Phillip got to the front porch, he saw his mother lying down and discovered that she had been shot in the chest. He laid her head on his lap and Adam, also now at the scene, attempted CPR without success.[6]

Jutta recalled that as she and Shirley were running out the front door of the house and down the porch steps, she immediately saw a shorter gunman coming

---

4. Jutta described the man as wearing a dark grey ski mask, a dark colored hoodie sweatshirt, and jeans.

5. The pistol was identified as a semi-automatic, 9mm handgun.

6. The assistant medical examiner found that Shirley Thomas died within minutes as the result of the gunshot wound to the chest, concluding that she had bled to death.

around the side of the house. He began shooting at them at close distance.[7] As the gunman turned to shoot, Shirley screamed and pushed Jutta back into the doorway. When Jutta realized that Shirley had been shot, Jutta crawled into the house, grabbed a phone to call 911, and hid in a closet. Once there, she heard more shots being fired.

Between 11:00 and 11:30 p.m. that night, Dewayne Ezzard was leaving his house for work. Dewayne lived a couple of blocks from Camden Avenue and across from Wyandotte Park. While in his car, he noticed someone running through Wyandotte Park (near the Thomas house), trying to flag him down.[8] When Dewayne arrived at work that night, one of his fellow workers stated that his aunt had just been shot right around the corner.

Jamilah was across the hall at a friend's apartment when Appellant finally returned. She testified that Appellant was crying and shaking and that he had driven back to her apartment alone. Appellant told Jamilah that he and Walker were in a backyard robbing a man and that he might have shot a woman who had come to the back door of the home with a weapon or a broom.[9] At this time, Walker called Appellant's cell phone and the two argued on the phone. Walker was screaming at Appellant so loud that Jamilah heard him say that he had been shot and that he wanted

to know why Appellant had left him at the scene. Appellant responded: "I told you to come on." They continued to argue and Walker asked Appellant why he shot "that lady." [10]

Walker then arrived at Jamilah's. He was wounded in the right shoulder and said to Appellant: "You left me for dead and I got shot." They continued to argue and an unidentified nurse came in to treat Walker's gunshot wound. After the nurse had left, Walker left as well. Appellant stayed the night at Jamilah's apartment. She stated that they watched the news that evening to see what was reported about the robbery and shooting.

The police came to Jamilah's apartment the next evening. Initially, she did not let them in because there were three outstanding bench warrants for her arrest. At some point, however, one of Jamilah's neighbors called and said that homicide detectives were outside and that they were looking for a wounded person. She let them in and, ultimately, the police arrested Appellant.[11] During their search of the premises, the police found a .38 caliber bullet in one of Appellant's jacket pockets. Among other items, the police also recovered a bag in Jamilah's garbage containing Walker's blood soaked clothing with a bullet hole in the shoulder of the right sleeve, as well as a black ski mask traced, via DNA analysis, to Appellant.[12]

7. The edge of the porch was located approximately three feet away from where the gunman fired his weapon.

8. At trial, he identified Walker as the man he had seen in the park, but stated that Walker had no mask and no firearm at that time. The police recovered a ski mask in Wyandotte Park on December 10, 2004.

9. Appellant also told Jamilah that he had run past a Caucasian male on his way to the car.

10. On cross-examination, Walker stated that he was referring to the woman in the back of the house.

11. Walker turned himself in the next day.

12. A search of Phillip's car revealed a right palm print and three left fingerprints (on the driver's exterior and interior window), all belonging to Appellant. A projectile fragment was found in the left rear tire of Phillip's car and the police located a bullet hole in the driver's side door. Police excluded the shots Adam fired from those that struck Phillip's

At the close of the Commonwealth's case, both Appellant and Walker moved for directed verdicts of acquittal on the homicide charge, each claiming that the evidence was insufficient and that the other had caused Shirley's death. The trial court denied both motions. Walker then presented his defense.

Walker's testimony differed significantly in some respects from the Commonwealth's theory of the case. Walker testified that on the evening of December 8, 2004, Appellant, along with Walker, had picked up Jamilah and her girlfriend in Appellant's car. Walker then stated that it was, in fact, the Appellant, and not him, that dropped everyone off at Jamilah's apartment. At some point later, Appellant called Walker at Jamilah's apartment and told Walker to come outside because they were going to "repo" a car for one of Appellant's friends.[13] Appellant drove to Camden Avenue and Walker claimed that he did not know where they were going. Walker stated that he never meant for anyone to get shot and that he did not know that Appellant was going to shoot anyone.

Walker claimed that Appellant pulled up in front of the Thomas house and parked a couple of houses down the street. They put their ski masks on and, allegedly, Appellant gave Walker a semi-automatic, 9mm handgun. Appellant told Walker to stay at the side of the house. Walker acknowledged that he was the man standing at the side of the house during the robbery, and that he heard Appellant shoot a woman standing in the back door.[14] At this point, Walker said that Appellant ran toward the front yard and his car. Walker, after hearing several more gunshots, also ran to the front yard and saw someone pointing a gun at him. Walker was then shot. Afterwards, he ran to the backyard and fired his weapon at Phillip's car, knowing that Phillip was still in the vehicle. Walker then fled to Wyandotte Park and threw his mask and gun away before running to a liquor store and asking for a ride to Jamilah's apartment.

On cross-examination, Walker claimed that Adam was mistaken when testifying that he had observed Appellant run to the car and leave prior to Shirley Thomas being shot. Walker concluded that Appellant fired his handgun in the front yard as he (Appellant) was running to his car and that he (Walker) "didn't see nobody" on the front porch. Walker, however, did admit that he ran through the front yard after hearing gunshots in front of the house. When asked if he was planning on helping Appellant, he indicated that he was not and could not explain why he ran to Appellant after hearing the gunshots.

Appellant, on the other hand, put on no evidence during the guilt phase. After both defendants had closed their cases, their respective counsel again moved for directed verdicts on the homicide charge regarding the death of Shirley Thomas. They also objected to the jury being instructed on homicide. Both the motions and objections were overruled by the trial court.

During closing arguments, Appellant admitted that he and Walker committed a

---

car, Jutta's leg, and Shirley's chest. However, police could not determine whether the bullets used to shoot the two victims had been fired from the same gun—only that they were fired from a .38 caliber revolver and not a semi-automatic handgun. The firearms used by the gunmen were never recovered.

**13.** The evidence did not show that either Appellant or Walker ever attempted to take Phillip's car during the robbery.

**14.** Walker testified that he heard a woman scream.

robbery and that he was "probably" the one who shot Jutta. Appellant, however, argued that it was Walker, and not him, that shot and killed Shirley Thomas. Walker, conversely, argued that he had simply gone with Appellant to repossess a car and that Appellant was the one who shot both Jutta and Shirley Thomas. The Commonwealth argued that Appellant and Walker had put on their ski masks and had taken loaded guns into Phillip's backyard in order to ambush, threaten, and rob him; that Appellant was the one who shot Jutta before driving away; that Walker was the one who shot Shirley Thomas before running through the backyard and firing at Phillip; and that both Appellant and Walker met up after the crimes to hide their clothing.

At the conclusion of the trial, Appellant was convicted on all counts of the indictment. In conjunction with Appellant's murder conviction, the jury found its commission during first-degree robbery to be an aggravating circumstance and fixed Appellant's prison sentence at fifty (50) years. The jury further fixed sentences of seventeen (17) years, ten (10) years, and two (2) years, respectively, on the other convictions, stating that they were to run consecutively with each other for a total of twenty-nine (29) years, but concurrently with the prior sentence of fifty (50) years, for a total sentence of fifty (50) years imprisonment.[15] On appeal, Appellant raises two principal allegations of error in the underlying trial: (1) that the evidence was insufficient to support Appellant's conviction for

complicity to murder; and (2) that the evidence did not reasonably support the murder instructions.

In addition, in his supplemental petition for rehearing, Appellant asks under CR 76.32(1)(b) as extraordinary grounds, that he be accorded the same ruling this Court made in his co-defendant's case, *Walker v. Commonwealth,* 288 S.W.3d 729 (Ky.2009), regarding his complicity to tampering with physical evidence conviction. Although Appellant's supplemental petition for rehearing is denied, we have modified this Opinion and thereby granted Appellant's request that he be relieved from his conviction for complicity to tampering with physical evidence on the same grounds as granted his co-defendant in *Walker, id.* We do so for reasons that the matter is timely, the error is "palpable," extraordinary grounds exist to do so, and justice demands it. *See* RCr 10.26; CR 76.32(1)(b). Thus, for the reasons that follow, we affirm Appellant's convictions in part and reverse in part.

## II. ANALYSIS

### A. The Trial Court Did Not Err In Denying Appellant's Motion For A Directed Verdict Because The Evidence Was Sufficient To Support His Complicity To Murder Conviction.

Appellant's primary argument is that his conviction should be reversed because the trial court, in denying his motion for a directed verdict, permitted his conviction on insufficient evidence and, in so doing,

---

**15.** Walker was also convicted of complicity to murder, complicity to robbery in the first degree, complicity to assault in the second degree, and complicity to tampering with physical evidence. Similarly, in conjunction with Walker's murder conviction, the jury found its commission during that of first-degree robbery to be an aggravating circumstance and fixed his prison sentence at fifty (50) years. The jury further fixed sentences of fifteen (15), five (5), and two (2) years, respectively, on the other convictions, stating that they were to run consecutively with each other for a total of twenty-two (22) years, but concurrently with the prior sentence of fifty (50) years, for a total sentence of fifty (50) years imprisonment.

denied him due process pursuant to *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).[16] Having reviewed the record, we decline to reverse Appellant's conviction because there was sufficient evidence to convict Appellant of complicity to murder.

In *Jackson,* the United States Supreme Court held that "an essential" protection "of the due process guaranteed by the Fourteenth Amendment" is that "no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof—defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense." *Jackson,* 443 U.S. at 316, 99 S.Ct. 2781. The Court, in *Jackson,* explained that while "the critical inquiry on review of the sufficiency of the evidence ... must be ... to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt," that "inquiry does not require a court to 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id.* at 318–19, 99 S.Ct. 2781 (*quoting Woodby v. Immigration and Naturalization Service,* 385 U.S. 276, 282, 87 S.Ct. 483, 17 L.Ed.2d 362 (1966) (emphasis in original)). "Instead," *Jackson* affirmed, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319, 99 S.Ct. 2781 (*citing Johnson v. Louisiana,* 406 U.S. 356, 362, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972)).

 Moreover, because *Jackson* "looks to whether there is sufficient evidence which, *if credited,* could support the conviction[,] ... the assessment of the credibility of witnesses is *generally beyond the scope of review." Potts v. Commonwealth,* 172 S.W.3d 345, 349 (Ky.2005) (*quoting Schlup v. Delo,* 513 U.S. 298, 330, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995) (emphasis in original)). *Jackson* "reserves questions of credibility for the finder of fact and does not require an evaluation of the 'qualitative sufficiency' of the evidence." *Potts,* 172 S.W.3d at 349; (*see, e.g., Commonwealth v. Smith,* 5 S.W.3d 126, 129 (Ky.1999) (The "[c]redibility and weight of the evidence are matters within the exclusive province of the jury.")). For this reason,

> [T]he testimony of a single witness which is assigned a likelihood of truth is sufficient to support a finding of guilt, and would justify a verdict in accordance with such testimony, even though a number of witnesses may have testified to the contrary if, after consideration of all of the evidence in the case, the factfinder assigns greater belief to the accuracy and reliability of the one witness.

*Murphy v. Sowders,* 801 F.2d 205, 210 (6th Cir.1986); *accord Commonwealth v. Suttles,* 80 S.W.3d 424, 426 (Ky.2002).

 The above principles are reflected in our familiar *Benham* standard of review for the denial of a directed verdict:

> [T]he trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true,

---

**16.** Appellant moved for a directed verdict at the close of the Commonwealth's case and at the close of the evidence. Appellee does not contend that Appellant's claim of error was not preserved for review.

but reserving to the jury questions as to the credibility and weight to be given to such testimony.

*Commonwealth v. Benham,* 816 S.W.2d 186, 187 (Ky.1991). For our purposes, "the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt." *Id.* (*citing Commonwealth v. Sawhill,* 660 S.W.2d 3 (Ky.1983)). Therefore, "there must be evidence of substance, and the trial court is expressly authorized to direct a verdict for the defendant if the prosecution produces no more than a mere scintilla of evidence." *Id.* at 187–88.

Turning to Appellant's case, the record demonstrates that the jury was instructed on both theories of complicity in KRS 502.020 in finding Appellant guilty of the murder of Shirley Thomas under KRS 507.020(1). KRS 502.020 embodies two distinct theories of complicity—also known as accomplice liability—which function to make one criminally liable for the conduct of another.[17] In *Tharp v. Commonwealth,* 40 S.W.3d 356, 360 (Ky.2000), we explained that:

> The primary distinction between these two statutory theories of accomplice liability is that a person can be guilty of "complicity to the act" under KRS 502.020(1) only if he/she possesses the *intent* that the principal actor commit the criminal act. However, a person can be guilty of "complicity to the result"

under KRS 502.020(2) without the intent that the principal's act cause the criminal result, but with a state of mind which equates with "the kind of culpability with respect to the result that is sufficient for the commission of the offense," whether intent, recklessness, wantonness, or aggravated wantonness.... The most common examples of offenses having a prohibited result are homicide, with the death of another as the prohibited result....

(*citing* KRS 502.020 official cmt. (1974)); R. Lawson and W. Fortune, *Kentucky Criminal Law.* §§ 3–3(b)(3), 3–3(c)(2) (1998) (emphasis in original).

### 1. KRS 502.020(1)

■ Drawing all fair and reasonable inferences from the evidence in favor of the Commonwealth, but reserving to the jury questions as to the credibility of the witnesses, sufficient evidence was presented to convict Appellant of complicity to the murder of Shirley Thomas under KRS 502.020(1).

■■ "To be guilty under subsection (1) for a crime committed by another, a defendant must have *specifically intended* to promote or facilitate the commission of that offense." *Harper v. Commonwealth,* 43 S.W.3d 261, 264 (Ky.2001) (*citing* KRS 502.020 official cmt. (1974) (emphasis in original)). "In the context of criminal

---

17. The relevant portions of KRS 502.020, "Liability for the conduct of another; complicity," read as follows:
(1) A person is guilty of an offense committed by another person when, with the intention of promoting or facilitating the commission of the offense, he:
(a) Solicits, commands, or engages in a conspiracy with such other person to commit the offense; or
(b) Aids, counsels, or attempts to aid such person in planning or committing the offense;

(2) When causing a particular result is an element of an offense, a person who acts with the kind of culpability with respect to the result that is sufficient for the commission of the offense is guilty of that offense when he:
(a) Solicits or engages in a conspiracy with another person to engage in the conduct causing such result; or
(b) Aids, counsels, or attempts to aid another person in planning, or engaging in the conduct causing such result;

homicide, a defendant can be found guilty by complicity of an intentional homicide [KRS 507.020(1)(a)] ... under KRS 502.020(1) only if there is evidence that he/she either actively participated in the actions of the principal ... *with the intent* that the victim's death ... would result." *Tharp*, 40 S.W.3d at 361 (*citing Skinner v. Commonwealth*, 864 S.W.2d 290, 300 (Ky. 1993) and *Gilbert v. Commonwealth*, 838 S.W.2d 376, 380 (Ky.1991) (emphasis in original)).

Sufficient evidence was presented to show that Appellant possessed the requisite intent under KRS 502.020(1). Testimony from Phillip, Jutta, and Adam, as witnesses to the crimes, indicated that Walker and Appellant fired upon, or attempted to fire upon, all witnesses they encountered. In addition, Walker testified that Appellant provided the handguns used in the robbery. Given that evidence, it would not be unreasonable for the jury to conclude that Appellant intended to promote or facilitate Walker in the murder of witnesses during their armed robbery of Phillip Thomas, including Shirley Thomas. *See Commonwealth v. Wolford*, 4 S.W.3d 534, 539 (Ky.1999) ("Although the prosecution in a criminal case has the burden of proving every element of the defendant's guilt beyond a reasonable doubt ... we have long held that mens rea, specifically intent, can be inferred from circumstances.").

In addition to showing intent, "[i]n a prosecution pursuant to KRS 502.020(1), ... the Commonwealth has the burden of proving [1] the commission of the charged offense by another person and [2] of proving that the defendant participated in that

offense." *Harper*, 43 S.W.3d at 265 (*citing* KRS 502.020 official cmt. (1974)); R. Lawson and W. Fortune, *Kentucky Criminal Law*, § 3–3(d)(2) (1998). Complicit conduct can be shown through either the existence of a basic conspiracy, KRS 502.020(1)(a), or aid and counsel, KRS 502.020(1)(b).[18] *See* Leslie W. Abramson, 10 *Kentucky Practice, Substantive Criminal Law*, § 3:5 (2nd ed. 2000).

Sufficient evidence was presented to show that Walker was the principal and that Appellant participated in the offense under KRS 502.020(1). Testimony from Phillip, Jutta, and Adam indicated that the shorter gunman, Walker, was the person that shot and killed Shirley Thomas. Walker testified that Appellant drove the car to the scene of the crime and provided the gun that was used in the robbery and, ultimately, in the murder. *See Hodge v. Commonwealth*, 17 S.W.3d 824, 841 (Ky. 2000) (*citing Murphy v. Commonwealth*, 652 S.W.2d 69 (Ky.1983) ("A conviction can be sufficiently supported even by the uncorroborated testimony of an accomplice.")). In addition, both Phillip and Walker testified that, during the commission of the armed robbery of Phillip, Appellant threatened to kill the first victim (Phillip) and he shot at the second victim (Jutta). Finally, in his closing, Appellant admitted involvement in the armed robbery of Phillip. Given that evidence, it would not be unreasonable for the jury to conclude that Walker shot and killed Shirley Thomas and that Appellant conspired or aided Walker in that offense.

### 2. KRS 502.020(2)

█ Drawing all fair and reasonable inferences from the evidence in favor of the

---

18. In *Tribbett v. Commonwealth*, 561 S.W.2d 662, 663 (Ky.1978), we explained that, for purposes of KRS 502.020, "[t]he conspiracy merely constitutes the factual basis supporting the agency relationship which imposes criminal liability upon [the Defendant] for the conduct of his partners in crime"; and in *Wolford*, 4 S.W.3d at 540, we rejected the idea that "a 'conspiracy' as envisioned by that statute necessarily requires detailed planning and a concomitant lengthy passage of time."

Commonwealth, but reserving to the jury questions as to the credibility of the witnesses, sufficient evidence was presented to convict Appellant of complicity to the murder of Shirley Thomas under KRS 502.020(2).

■■ "A person can be guilty of 'complicity to the result' under KRS 502.020(2) without the intent that the principal's act cause the criminal result, but with a state of mind which equates with 'the kind of culpability with respect to the result that is sufficient for the commission of the offense' whether intent, recklessness, wantonness, or aggravated wantonness." *Tharp*, 40 S.W.3d at 360. *Unlike* KRS 502.020(1), one can be convicted of complicity to murder under KRS 502.020(2) if there is evidence that he or she "actively participated in the actions of the principal ... *without the* [specific] *intent* that those actions would result in the victim's death, but with ... aggravated wantonness, *i.e.*, wantonness creating a grave risk of death under circumstances manifesting an extreme indifference to human life." *Tharp*, 40 S.W.3d at 361 (emphasis in original); *accord Kruse v. Commonwealth*, 704 S.W.2d 192, 194 (Ky.1985) ("If a felony participant other than the defendant commits an act of killing, and if a jury should determine from all the circumstances surrounding the felony that the defendant's participation in that felony constituted wantonness manifesting extreme indifference to human life, he is guilty of murder under KRS 507.020(1)(b).").

■ In the context of robbery, our decision in *Kruse* mandates that we measure Appellant's culpability "by the extent of [his] participation in the underlying robbery *rather than* by the implication of intent to murder from the intent to participate in the robbery." 704 S.W.2d at 195 (emphasis added). Consistent with *Kruse*, we have held that "the facts proving the element of endangerment necessary to convict of first-degree robbery may be the same facts which prove the element of aggravated wantonness necessary to convict of wanton murder." *Meredith v. Commonwealth*, 164 S.W.3d 500, 505 (Ky.2005) (*citing Bennett v. Commonwealth*, 978 S.W.2d 322, 327 (Ky.1998)).

Applying these principles to Appellant's claim of error, we find that sufficient evidence was presented to show that Appellant possessed the requisite culpability under KRS 507.020(1)(b) to make him an accomplice to the result under KRS 502.020(2). Unrebutted testimony demonstrated that Appellant participated in, if not led, the armed robbery of Phillip Thomas. Moreover, Appellant admitted his involvement in the armed robbery. In addition, Walker testified that Appellant provided the firearms and ski masks used in the robbery and that Appellant first threatened to kill Phillip and, subsequently, was the first to shoot a witness, Jutta.[19] Appellant's participation in the underlying robbery, therefore, was substantial and evidence was presented that Appellant threatened and used deadly force. Given that evidence, it would not be unreasonable for the jury to conclude that Appellant acted as an accomplice to the murder of Shirley Thomas with wantonness, creating a grave risk of death under circumstances manifesting an extreme indifference to human life. Therefore, the evidence was sufficient to withstand Appellant's directed verdict motions pursuant to *Benham*. Accordingly, we

---

**19.** Phillip testified that he was all but certain that Appellant, the taller gunman, was the one who shot Jutta.

find no reversible error in the trial court's handling of this matter.

## B. Because The Evidence Was Sufficient To Support The Jury Instructions, Appellant Was Not Denied His Right To A Unanimous Verdict.

Appellant argues that his conviction should be reversed because the trial court, in overruling his objection to the murder instructions, allowed the jury to convict him of murder on theories unsupported by the evidence, thus denying him his right to a unanimous verdict under Section 7 of the Kentucky Constitution and RCr 9.82(1). We decline to reverse Appellant's conviction for reasons that the instructions were supported by the evidence.

The jury was instructed pursuant to KRS 507.020(1), representing a combination principal-accomplice instruction.[20] The pertinent jury instructions read as follows:

### INSTRUCTION NO. 1—MURDER (COMPLICITY)

You will find the defendant, TYWAN BEAUMONT, guilty of Murder (Complicity), under this Instruction if, and only if, you believe from the evidence beyond a reasonable doubt, all of the following:

A. That in this county on or about December 8, 2004, he, acting alone or in complicity with Christian O. Walker, killed Shirley Thomas, by shooting her with a deadly weapon;

AND

B. That in so doing, he caused the death of Shirley Thomas intentionally.

OR

C. He was wantonly engaging in conduct which created a grave risk of death to another and thereby caused the death of Shirley Thomas under circumstances manifesting an extreme indifference to the vale of human life.

If you do not find the defendant guilty under this Instruction, you may find him guilty under Instruction No. 2 [Manslaughter in the Second–Degree]. If you find the defendant guilty under this Instruction, you will say so by your verdict and no more.

A definitional instruction followed, defining the two forms of complicity found in KRS 502.020 and their relevant subsections:

Complicity as to a Criminal Act—Means that a person is guilty of an offense committed by another person when, with the intention of promoting or facilitating the commission of the offense, he solicits, commands, or engages in a conspiracy with such other person to commit the offense, or, aids, counsels, or attempts to aid such person in planning or committing the offense.

Complicity as to a Criminal Result— Means that a person is guilty of an

---

20. The relevant portions of KRS 507.020, "Murder," are as follows:

(1) A person is guilty of murder when:
(a) With intent to cause the death of another person, he causes the death of such person or of a third person; except that in any prosecution a person shall not be guilty under this subsection if he acted under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be. However, nothing contained in this section shall constitute a defense to a prosecution for or preclude a conviction of manslaughter in the first degree or any other crime; or
(b) Including, but not limited to, the operation of a motor vehicle under circumstances manifesting extreme indifference to human life, he wantonly engages in conduct which creates a grave risk of death to another person and thereby causes the death of another person.

offense committed by another person when, while acting wantonly with extreme indifference to the value of human life with regards to the result of another's conduct, he solicits, commands, or engages in a conspiracy with such other person in planning or committing such conduct.

Out of these instructions, there existed four possible theories on which the jury could convict Appellant of murder: (1) as a principal to KRS 507.020(1)(a); (2) as a principal to KRS 507.020(1)(b); (3) as an accomplice to KRS 507.020(1)(a), under KRS 502.020(1); and (4) as an accomplice to KRS 507.020(1)(b), under KRS 502.020(2). The jury's verdict, however, did not specify the grounds on which it found Appellant guilty of complicity to murder.[21]

■■■ Although "Section 7 of the Kentucky Constitution requires a unanimous verdict reached by a jury of twelve in all criminal cases," "[i]t is not necessary that a jury, in order to find a [unanimous] verdict, should concur in a *single* view of the transaction disclosed by the evidence." *Wells v. Commonwealth*, 561 S.W.2d 85, 88 (Ky.1978) (emphasis added) (*quoting People v. Sullivan*, 173 N.Y. 122, 65 N.E. 989, 990 (1903)). Rather, where "the proof of either [theory] beyond a reasonable doubt constitutes the same offense," the inquiry turns on whether the "interpretations are supported by the evidence." *Hudson*, 979 S.W.2d at 109; *see also Barbour v. Commonwealth*, 824 S.W.2d 861, 863 (Ky.1992) ("An instruction of an alternative nature is proper only when either theory (intentional/wanton) is reasonably supported by the evidence."); *Burnett v. Commonwealth*, 31 S.W.3d 878, 883 (Ky.2000) ("[T]he Commonwealth has to show that it has met its burden of proof under all of the alternate theories presented in the instruction."). Having already found the evidence sufficient to sustain Appellant's conviction as an accomplice under both KRS 502.020(1) and (2) to Walker's offense under KRS 507.020(1), we examine, in turn, the only remaining theory the jury could have considered to determine whether it, too, was supported by the evidence: that Appellant acted as a principal to KRS 507.020(1).

We have held that "[t]he testimony of even a single witness is sufficient to support a finding of guilt, even when other witnesses testified to the contrary if, after consideration of all of the evidence, the finder of fact assigns greater weight to that evidence." *Suttles*, 80 S.W.3d at 426 (*citing Murphy*, 801 F.2d at 210). At trial, Walker testified that Appellant picked him up and drove to the Thomas house where the two men—concealed in ski masks and armed with guns provided by Appellant—lay in wait in anticipation of robbing Phillip. Upon Jutta opening the kitchen door, Appellant, according to Walker, immediately shot her and then ran to the front of the house and shot Shirley Thomas as the

**21.** We continue to "strongly emphasize that, when intentional and wanton murder are included in a single instruction, the preferred practice is to include a form verdict that requires the jury to state whether guilt is found under the theory of intentional murder or under the theory of wanton murder." *Hudson v. Commonwealth*, 979 S.W.2d 106, 110 (Ky.1998); *Benjamin v. Commonwealth*, 266 S.W.3d 775, 785 (Ky.2008) ("Therefore, we reiterate our prior directive: when giving combination jury instructions reflecting distinct theories of culpability which bear equal punishment, trial courts should preliminarily determine if there is evidence to support a combination instruction; if the trial judge finds that the evidence is unlikely to support a combination instruction, the court should include separate verdict forms, and if the evidence suffices, the court may use a combination instruction which permits the jury to distinguish upon which theory it bases its findings.").

women were trying to escape. Therefore, we find Walker's testimony sufficient evidence for a jury instruction that he acted as a principal to either KRS 507.020(1)(a) or KRS 507.020(1)(b).

"This Court has held that because a person is presumed to intend the logical and probable consequences of his conduct, a person's state of mind may be inferred from his actions preceding and following the charged offense." *Suttles*, 80 S.W.3d at 426 (*citing Hudson*, 979 S.W.2d at 110). At trial, Jutta testified that the gunman shot Shirley Thomas in the chest while she was on the edge of the porch, separated by a distance of three feet. Walker testified that it was the Appellant who did so. In tandem, we find that this evidence reasonably supported a jury instruction that Appellant shot and killed Shirley Thomas with intent under KRS 507.020(1)(a).

We have held that "the culpable mental state defined in KRS 501.020 as wantonness . . . without more, will suffice for a conviction of manslaughter in the second degree but not for murder because, to qualify as murder, a capital offense, it must be accompanied by further circumstances manifesting extreme indifference to human life," an issue that is best left for the jury. *Brown v. Commonwealth*, 174 S.W.3d 421, 425–26 (Ky.2005) (*citing McGinnis v. Commonwealth*, 875 S.W.2d 518, 520 (Ky.1994)). Evidence was presented by Walker and others that Appellant fired upon all witnesses he encountered: first, at Jutta, who was in an occupied home; then, at Shirley Thomas, as he was fleeing the scene of the robbery. We find that this evidence reasonably supported that Appellant acted wantonly with extreme indifference to the value of human life sufficient to instruct the jury that he acted as a principal under KRS 507.020(1)(b) to the murder of Shirley Thomas.

Having found that all theories presented to the jury were supported by the evidence, we cannot say that Appellant's right to a unanimous verdict was violated in convicting him of complicity to murder. Therefore, we affirm Appellant's conviction.

## C. The Trial Court's Reinstatement Of The Tampering With Physical Evidence Charge Was A Violation of Double Jeopardy Because Appellant's Acquittal Was Final.

█ Finally, Appellant contends that his conviction should be reversed because the trial court, in reinstating a charge against him, placed him in double jeopardy in violation of the Fifth and Fourteenth Amendments of the United States Constitution, as well as Section 13 of the Kentucky Constitution. We agree and, therefore, reverse Appellant's conviction for complicity to tampering with physical evidence for the same reasons set forth in *Walker v. Commonwealth*, 288 S.W.3d 729. Accordingly, we only restate here what occurred in Appellant's trial and briefly consider the factual elements now present that were not before us in *Walker*.

At the close of the Commonwealth's case, Appellant and Walker moved the trial court for a directed verdict as to the tampering with physical evidence charge and argued that it had not been supported by sufficient evidence. The Commonwealth, in a brief response, explained that the charge related to "throwing the guns away." Unable to recall evidence as to this fact, the trial court stated that the defense motion "was sustained as it relates to the tampering with physical evidence." Walker then proceeded with his defense.

At the close of the evidence, however, the Commonwealth moved the trial court "to reconsider" its prior directed verdict, arguing that the tampering indictment was "open-ended" and that they had, in fact,

presented evidence that certain items—such as clothing and ski masks—had been intentionally disposed of by the co-defendants with the knowledge that they had shot someone.[22]

Upon hearing the Commonwealth's motion, the trial court stated that it had not previously considered these items and that the court's prior ruling had related only to handgun evidence. On that basis, and over the co-defendants' objection, the trial court reinstated the tampering with physical evidence charge and allowed the Commonwealth an instruction as it related to the clothing and ski masks.[23] Thereafter, both Appellant and Walker closed their cases.

In *Walker*, we applied the United States Supreme Court's most recent dictates in *Smith v. Massachusetts*, 543 U.S. 462, 125 S.Ct. 1129, 160 L.Ed.2d 914 (2005) and held that "the trial court's subsequent reinstatement of the tampering charge and its instruction to the jury was a violation of the Double Jeopardy Clause of the Fifth Amendment as it represented 'postacquittal factfinding proceedings going to' Appellant's 'guilt or innocence.'" *See Walker*, 288 S.W.3d at 746–47 (*quoting Smalis v. Pennsylvania*, 476 U.S. 140, 145, 106 S.Ct. 1745, 90 L.Ed.2d 116 (1986)).

Here, the only apparent difference from the case in *Walker* is that Appellant did not present a defense after the trial court's " 'facially unqualified midtrial dismissal' " of the tampering charge. *Walker, id.* at 745 (*quoting Smith*, 543 U.S. at 473, 125 S.Ct. 1129). The Court in *Smith* was, indeed, peculiarly concerned with the defendant who does go on to present a defense rely-

ing upon a midtrial acquittal and the trap that could create to *that* defendant. *See* 543 U.S. at 471–72, 125 S.Ct. 1129 ("[W]hen ... the trial has proceeded to the defendant's presentation of his case, the possibility of prejudice arises. The seeming dismissal may induce a defendant to present a defense to the undismissed charges when he would be better advised to stand silent."). That factual scenario, after all, was the one before the Court in *Smith, See id.* at 472 n. 6, 125 S.Ct. 1129 ("[T]he potential effect upon codefendants has no bearing upon [Smith's] double-jeopardy claim.").

Yet, ultimately, because Appellant's co-defendant did present a defense to the charge and, therein, "admitted to have thrown away both a gun and ski mask in the park," *Walker*, 288 S.W.3d at 746 n. 26, we believe that Appellant was made to suffer the onus of double jeopardy no less than Walker. The crime for which Appellant and Walker were acquitted and subsequently convicted was for *complicity* to tampering with physical evidence. Thus, in this respect, Walker's testimony "provide[d] corroboration for essential elements of the [Commonwealth's] case" against both defendants. *Smith*, 543 U.S. at 472, 125 S.Ct. 1129 (*citing United States v. Calderon*, 348 U.S. 160, 164 n. 1, 75 S.Ct. 186, 99 L.Ed. 202 (1954)); *see generally* KRS 502.020. To be sure, the trial court reinstated the tampering charges against both Walker *and* Appellant after only Walker's testimony. Moreover, should we hold otherwise here and thus require Appellant to show that the trial court's reinstatement of the charge actually prejudiced him, we would run the risk of

---

22. The indictment, under KRS 524.100, was general and did not specify the underlying items of evidence.

23. A failure to object to a double jeopardy violation does "not constitute a waiver of the

right to raise the issue for the first time on appellate review." *Gunter v. Commonwealth*, 576 S.W.2d 518, 522 (Ky.1978) (*citing Sherley v. Commonwealth*, 558 S.W.2d 615, 617 (Ky. 1977)).

adopting a position that *Smith* expressly rejected. *See* 543 U.S. at 473 n. 7, 125 S.Ct. 1129 ("[T]he Double Jeopardy Clause has never required prejudice beyond the very exposure to a second jeopardy. To put it differently: Requiring someone to defend against a charge of which he has already been acquitted is prejudice *per se* for purposes of the Double Jeopardy Clause—even when the acquittal was erroneous because the evidence was sufficient."); *see also Walker*, 288 S.W.3d at 745 n. 25. Finally, we perceive nothing in *Smith* that forbade its application to facts before us.[24] Rather, its concerns encourage our conclusion. *See* 543 U.S. at 473 n. 7, 125 S.Ct. 1129 ("Our double-jeopardy cases make clear that an acquittal bars the prosecution from seeking 'another opportunity to supply evidence which it failed to muster' before jeopardy terminated.") (*quoting Burks v. United States*, 437 U.S. 1, 11, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978)).

### III. CONCLUSION

Therefore, for the above stated reasons, Appellant's conviction for complicity to tampering with physical evidence is reversed and this case is remanded to the Jefferson Circuit Court for further proceedings in accordance with this opinion. All of Appellant's other convictions herein are affirmed.

CUNNINGHAM, NOBLE, SCHRODER, SCOTT and VENTERS, JJ., concur.

MINTON, C.J., and ABRAMSON, J., concur in result only.

24. Smith did acknowledge the potential harmful effects that an apparent midtrial acquittal could have upon co-defendants. *See* 543 U.S. at 472 n. 6, 125 S.Ct. 1129 ("[T]he potential effect upon codefendants ... does confirm the wisdom of the rule we adopt.").